## SWEET *v.* RECHEL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MASSACHUSETTS.

No. 18. Argued December 14, 1894. — Decided October 21, 1895.

The authority of a legislature to enact provisions for taking private property for public use rests upon its right of eminent domain; and it is a condition precedent to its exercise that the statute conferring the power make reasonable provision for compensation to the owner of the land.

Unless the constitution of the State in which the lands are situated requires payment or tender of payment for land so taken for public use before the rights of the public therein can become complete, a statute which authorizes the taking of the property for public use and directs the ascertainment of the damages without improper delay and in a legal mode, and which gives the owner a right to judgment therefor, to be enforced by judicial process, is sufficient to transfer the title.

The act of the legislature of Massachusetts of June 1, 1867, c. 308, to enable the city of Boston to abate a nuisance, and for the preservation of the public health in said city, and which provided for the taking of certain private lands therein, and for their improvement, filling up, and complete draining, so as to abate an existing nuisance and preserve the health of the city, and which further provided for the payment of the cost of the lots so taken through judicial proceedings, was within the

constitutional power of the legislature of that State, and the fee in said lands, when acquired by the city, passed to it under the act, and the previous owners ceased to have any interest in them, but were only entitled to reasonable compensation, to be ascertained in the manner provided by the act.

THE real estate — the title to which is involved in the present writ of entry — formerly belonged to Peleg Tallman, Sen., of Maine, who died on the 12th day of March, 1840, having made a will which was duly admitted to record in that State, and a copy whereof was admitted to probate, May 10, 1841, in Suffolk County, Massachusetts, where the premises in controversy are situated.

The parcel of land in dispute, with other real estate, was devised to Henry Tallman, to hold for life, and at his decease to descend to his son Peleg Tallman, Jun. The devisee in remainder was born April 18, 1836, and died April 15, 1863, leaving two children, Frank G. Tallman and Peleg H. Tallman; also a widow, who subsequently intermarried with William A. Sweet, one of the plaintiffs in error.

The plaintiffs in error, who were the plaintiffs below and are citizens of New York, claim title under the will of Peleg Tallman, Sen.

The defendant, a citizen of Massachusetts, claims title under proceedings instituted by the guardian of the devisee in remainder in the probate court of Suffolk County, Massachusetts, by the order of which court, and in full compliance therewith, as is contended, the interest of Peleg Tallman, Jun., in certain real estate, including the lot in dispute, was sold in 1844 — Henry Tallman, the owner of the life estate, becoming the purchaser. In the same year the latter conveyed, with warranty, to Robert Knott who purchased in good faith at the price of $2900. In 1869, Knott conveyed by warranty deed to the defendant Rechel, for the sum of $4800 in cash or its equivalent. Rechel bought in good faith, for full value, without actual notice of any alleged defect in the title, and erected buildings and made improvements on the premises in dispute at a cost of $8575.

The defendant also claims that the title to the lot in con-

troversy was taken by the city of Boston in 1867 — the title being, at that time, apparently, in Knott — under a statute of Massachusetts, approved June 1, 1867, entitled "An act to enable the city of Boston to abate a nuisance existing therein, and for the preservation of the public health in said city." Laws of Mass. 1867, c. 308.

By reason of its grade being lower, and because it was incapable of being properly drained, the condition of the territory, of which the lot in controversy was a part, was such during the period between the years 1860 and 1870 as to endanger the public health. Various plans having been suggested for the raising of the grade and for the proper drainage of that territory, the legislature passed the act of June 1, 1867.

By that act it was provided that the city of Boston "may purchase or otherwise take the lands or any of them in said city, with the buildings and other fixtures thereon," situated within a certain defined district which included the lands here in dispute; that the "city shall within sixty days from the time they shall take any of said lands, file in the office of the registry of deeds for the county of Suffolk, a description of the lands so taken, as certain as is required in a common conveyance of lands," with "a statement that the same are taken pursuant to the provisions of this act, which said description and statement shall be signed by the mayor of said city;" that "*the title* to all land so taken *shall vest in the city of Boston*, and if any party whose land is taken shall agree with the said city upon the damage done to him by the said taking, *the same shall be paid to him by the said city forthwith.*" It was made "the duty of the city of Boston forthwith to raise the grade of said territory so taken or purchased, laying out and filling up the same with good materials, with reference to a complete drainage thereof, so as to abate the present nuisance and to preserve the health of the city." § 1.

Any person having an interest in the land taken, was at liberty, within one year after the same was taken, as well in his own behalf as in behalf of all other persons having estates therein, to file a bill in equity in the Supreme Judicial Court, in the county of Suffolk, setting forth the taking of

the complainant's land, the condition of the same in respect
to its capacity for drainage, and whether the complainant
claimed any and what damages against the city or the Boston
Water Power Company, or other corporation or person, "by
reason of any and what wrongful act or omission by their
causing a diminution in the value of his land at the time of
said taking, and praying an assessment of damages against
such parties" — notice of such bill being given to the parties
named therein as defendants, according to the course of courts
of equity, and also public notice thereof, to all persons in
whose behalf such bill was filed, to appear and become parties
thereto, if they thought fit to do so. It was made the duty
of the court to prescribe how such public notice should be
given, and what length of time should be allowed for appear-
ing and becoming a party to the suit. Any one interested
who failed to appear and become a party within the time
prescribed by the court was forever barred from recovering
any damages on account of such taking. Each person appear-
ing and becoming a party, having filed a written description
of the land in which he claimed an estate, together with a
plan thereof, so as clearly to distinguish the same from all
other lands, was required to declare what estate he claimed
therein. If he claimed that the value of said lands at the
time of the taking was lessened by any unlawful act or omis-
sion of the city of Boston, or of the Boston Water Power
Company, or of any other corporation or person, "so that the
value of the land in its condition when taken would not be a
just compensation for all the estate and rights of the party in
and in reference to the same," he was also to state "what
such injury is, and how and by whom the same had been, or
is, caused, and what right or title of the party is violated, and
what amount of damages in gross is claimed by him, as com-
pensation therefor, from each of the parties defendant." § 2.

Other sections of the act provided for the appointment of
commissioners to hear the parties, after due notice, to assess
the value of the land taken, and to make report to the court
of their doings. Any party aggrieved by the report might
except thereto and have his exception heard as in a suit in

equity, or might apply for the framing of proper issues to be tried by a jury.

The seventh section provides: "When it shall be finally determined what amount of damages any party is entitled to recover against the city of Boston, or the Boston Water Power Company, or any other party defendant, a separate decree shall be entered accordingly and execution therefor shall be issued, without regard to the pendency of the claims of any other party or parties, or of other claims of such complainant."

The city council approved and spread upon its records an instrument reciting the act of 1867, and stating that, pursuant to its provisions, the city "has taken, and by these presents does take," a certain parcel of land "belonging to Robert Knott" — in whose name, as we have seen, the title then stood of record — "to have and to hold the same to the said city of Boston, its successors and assigns, to its and their sole use and behoof forever, agreeably to the provisions of the said act." This instrument was approved by the mayor, who certified that "the lands described in said instrument were and are taken pursuant to the provisions of the said act." Within sixty days of the taking of the land, to wit, on May 22, 1868, that instrument was filed in the Suffolk registry of deeds, and was fully recorded.

It was admitted at the trial that the city followed the provisions of the statute, and that the premises were held by the defendant under Knott and the city; also, that the city forthwith performed the duty imposed on it by the statute at an immense outlay; that "the grade of the land was raised and the buildings thereon, the territory was laid out and filled, a complete and effective system of drainage was provided, the nuisance abated, and the value of the land was greatly enhanced. The lot in suit was filled in to a depth of several feet, the buildings were raised and underpinned, and the value increased."

Subsequently, a settlement was had with the assignee of Knott, in relation to the taking of the land, and — Knott having executed a release — the city conveyed, by deed of

March 14, 1870, to the defendant Rechel, the deed reciting that the property had been previously taken by the city under the above act of 1867.

It was also admitted that no compensation was ever paid to the plaintiffs by reason or on account of any proceedings by the city under the act of June, 1867. And it was agreed that "in 1869 a bill in equity was brought under the statute, reported in 109 Mass. 438, the case being *Cobb* v. *Boston,* on behalf of Cobb and all others entitled to have damages assessed for this taking; that this case was pending in the Supreme Court until the April term, 1882; that it was ordered by the court in this case that the time from December 23, 1869, to first Tuesday of April, 1870, be allowed to parties to bill; that notice was published in papers on said order, and that such persons as came in had their damages assessed under said bill."

*Mr. Thomas A. Jenckes,* (with whom was *Mr. James E. Leach* on the brief,) for plaintiffs in error, argued, (1) that there were defects of procedure in the Probate Court and in the subsequent acts of the guardian to divest the ward of his title to this real estate; and (2) that the proceedings under the act of June 1, 1867, did not divest the plaintiff in error of his title. The view taken of the case by the court renders it unnecessary to notice the position of counsel with respect to the first of these points. In regard to the second be contended as follows:

The provisions in this act that the city shall take the land, that the title to the land taken shall vest in the city, that the owner shall agree with the city upon the damage done to him by the taking and the payment therefor, that in case the owner and city cannot agree, a mode for ascertaining payment is provided, by suit and appointment of commissioners to assess the damages, and an appeal to a jury, upon proper issues, are all inconsistent with the idea that the act was framed for the purpose of exercising the general police or superintending power over private property, which is vested in

the legislature, or in order to prohibit a use of it, which was deemed injurious to or inconsistent with the rights and interests of the public. If such were the object of the statute, there would be no necessity for the appointment of commissioners, — or for the provisions making compensation to those injured in their property thereby. Such enactments would be unusual in a statute intended only for a prohibition and restraint upon the appropriation or use of private property by its owners; but are the necessary and ordinary provisions where the legislature intend to exercise the right to take it for a supposed public use. *Talbot* v. *Hudson*, 16 Gray, 417.

It has been determined, by a course of decisions in Massachusetts, that the power of the legislature to pass this and similar acts lies in the provision of the Constitution, Part II, c. 1, art. 4, that, "full power and authority are hereby given and granted to the said general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this commonwealth." *Dingley* v. *Boston*, 100 Mass. 544; *Lowell* v. *Boston*, 111 Mass. 454; *Turner* v. *Nye*, 154 Mass. 579.

If, therefore, the act of June 1, 1867, was passed under the authority "to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes, and ordinances, — so as the same be not repugnant or contrary to this constitution" (as *Dingley* v. *Boston* decides,) and if this "provision above quoted does not authorize the legislature to take property from one person and give it to another, nor to take private property for public uses without compensation," (*Turner* v. *Nye*,) then it is submitted that no title to the land in question ever passed to the city of Boston, because no compensation was ever actually paid to the owners.

It is urged by the defendant that the act in question, because it provides a mode for ascertaining the amount of compensation, is constitutional, and to that proposition the plaintiffs in error make no dissent; but unless compensation for

the land taken and appropriated is actually made, no title passes; in other words, the plaintiffs in error assert that the title to the land did not *vest* in the city of Boston, unless compensation had, in a form to comply with the requirements of the constitution, actually been made. For it is a prime requisite that compensation shall be made for the appropriation of lands for public purposes.

It is incumbent on the party taking or his grantee to prove that this constitutional provision has been complied with, or else title derived under the act of condemnation will be invalid. The construction and application of this constitutional provision should be vigorously upheld in its full extent and fair meaning, as affording the only adequate security and protection to private property. *People* v. *McRoberts*, 62 Illinois, 38; *Stacey* v. *Vermont Cent. Railroad*, 27 Vt. 39; *Balt. & Susquehanna Railroad* v. *Nesbit*, 10 How. 395.

In all the cases which we have examined, where the fee of the condemned land has become vested in a municipal or other corporation, the compensation for the land taken has been made, and the courts have all declared such to be a constitutional prerequisite to the vesting of the title. In all where there have been attempts on the part of the former owners, although they have been paid the full value of the land taken, either to recover subsequently the land itself or to prevent the municipal or other corporation from selling or disposing of it, on the ground that the municipal or other corporation, upon an abandonment or vacation of the use for which it was originally taken, had no right to put the property to a different use than the one contemplated by the special act, compensation had been made. In no case, however, have we found that where compensation has not been made, has the title vested, either by virtue of the act of the legislature or by the taking and use of the land, without first having compensated the owner. *Water Works Co.* v. *Burkhart*, 41 Indiana, 364; *Brooklyn Park Commissioners* v. *Armstrong*, 45 N. Y. 234; *Coster* v. *New Jersey Railroad*, 23 N. J. Law, (3 Zabriskie,) 227; *De Varaigne* v. *Fox*, 2 Blatchford, 95; *Wheeler* v. *Rochester & Syracuse Railroad*, 12 Barb. 227;

*Baker* v. *Johnson,* 2 Hill, 342; *Heyward* v. *New York,* 7 N. Y. 314; *Bloodgood* v. *Mohawk & Hudson River Railroad,* 18 Wend. 9; *Walther* v. *Warner,* 25 Missouri, 277; *San Francisco* v. *Scott,* 4 California, 114; *Fox* v. *Western Pacific Railroad,* 31 California, 538; *Henry* v. *Dubuque & Pacific Railroad,* 10 Iowa, 540; *Ferris* v. *Bramble,* 5 Ohio St. 109; *State* v. *Graves,* 19 Maryland, 351; *Bonaparte* v. *Camden & Amboy Railroad,* Baldwin, 205; *Nichols* v. *Somerville & Kennebec Railroad,* 43 Maine, 359.

In *Kennedy* v. *Indianapolis,* 103 U. S. 599, the facts were these: An act of the legislature of Indiana, passed January 27, 1836, authorized the board of internal improvements to construct the Central Canal, and for this purpose to enter upon, take possession of and use any lands necessary for the prosecution and completion of the work; and provided that persons injured by what was done could claim damages, which were to be appraised in a certain way, but in making the appraisement the benefits resulting to the claimant were to be taken into consideration, and any sum found to be due was to be paid by the board, but no claim could be recovered or paid unless made within two years after the property was taken possession of. The board was also authorized to acquire, by donation or purchase for the State, the necessary ground for the profitable use of any water power that might be created by the construction of the canal, and to lease for hydraulic purposes any surplus of water there might be over and above what was required for navigation. Section 7, Art. 1, of the constitution of Indiana provided, " that no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without a just compensation being made therefor."

The canal was built, and the land involved in the suit was taken, but no compensation was ever made to the then owner. In 1850 the legislature passed an act to sell the canal, and the land in question was sold, and the question as presented, was the appropriation by the State sufficient to divest the owners of their title, and convey to the purchasers under the act of 1850 any title to the premises. The case was a bill in

equity brought to quiet the title to these lands by the grantees from the purchaser under the sale thereof by virtue of the act of 1850.

Chief Justice Waite says, in reviewing the Indiana cases: "But, so far as we have been able to discover, it has never yet been held that the title passed·out of the owner until 'just compensation' had actually been made. In fact the decisions appear to have been uniformly to the effect that it did not." After referring to the New York and Maine cases he says: "Not to multiply cases further, it seems to us that on principle and authority the rule is, under such a constitution as that of Indiana, that the right to enter on and use the property is complete as soon as the property is actually appropriated under the authority of law for a public use, but that the title does not pass from the owner without his consent until just compensation has been made to him. . . . It is not contended that compensation in money was ever made for any of the land in dispute. . . . To hold that the title passed by mere appropriation, if no claim for damages was made within the two years, would be in effect to decide that if the State entered on land·for a particular use and kept possession as against the owner for two years, it got a title in fee whether the property was ever put to the use or not. Such we cannot believe to be the law."

If possession of the property has been actually taken without compensation to the owner, then the owner becomes entitled to recover possession by an action of ejectment. *Doe* v. *Georgia Railroad and Banking Co.*, 1 Georgia, 524; *Gardiner* v. *Tisdale*, 2 Wisconsin, 153; *Weisbrod* v. *Chicago & Northwestern Railway*, 21 Wisconsin, 602; *Wager* v. *Troy Union Railroad*, 25 N. Y. 526; *Lezier* v. *New York Central Railroad*, 42 Barb. 466; *Nichols* v. *Lewis*, 15 Conn. 137; *McClinton* v. *Pittsburg, &c. Railroad*, 66 Penn. St. 404; *Chicago, Burlington &c. Railroad* v. *Knox College*, 34 Illinois, 195.

The fact that opportunity was provided in the act for compelling compensation is not sufficient, and there is no obligation imposed on the owner to resort to a legal tribunal to enforce payment.

The Circuit Court decided that the land was not taken under the right of eminent domain, but under the police power of the State. The case of *Bancroft* v. *Cambridge*, 126 Mass. 438, is cited in its opinion not as conclusive of the present case, but as illustrative that the present act was passed in exercise of the police power of the legislature, and that the act in question can be justified under that power. From a comparison of the act commented upon in that case, it will be seen that it is totally different from the act involved in this case. The act in *Bancroft* v. *Cambridge* was a regulation or restraint solely upon the owners in the use of their property, and it gave the municipality authority to raise the grade of the land, and made the expenses a lien or charge on the lands filled to be collected in the manner provided for the collection of taxes on real estate. In other words, it belonged to that class of cases, in which the owners of lands are required to make an improvement for the benefit of the public, and the whole expense thereof is charged to them. It is based, however, upon the theory that there is a consequent increase in the value of the owners' lands. See also *Dingley* v. *Boston*, 100 Mass. 544; *Hingham & Quincy Bridge and Turnpike Co.* v. *Norfolk County*, 6 Allen, 353; *Lowell* v. *Boston*, 111 Mass. 454. In this case there was a taking of property from an individual, and giving it to another without compensation, and no court has heretofore justified such a proceeding. It is contrary to the principle under which acts of the legislature in exercise of the police power have been passed. It is not the owner's use of the property which is destroyed, but the property itself which is taken. It is not a regulation of the use of the property under the maxim, "*sic utere tuo ut alienum non lædas*," but is a confiscation and appropriation of property without compensation.

In *Commonwealth* v. *Alger*, 7 Cush. 53, Chief Justice Shaw forcibly presented the difference between the exercise of the police power of the State and the assertion of its right of eminent domain. But in no case in Massachusetts has the police power been enlarged to include the taking of private property, except in case of forfeiture for crime. *Dingley* v.

*Boston,* 100 Mass., 544; *State* v. *Tewksbury,* 11 Met. 55; *Fisher* v. *McGirr,* 1 Gray, 1; *Talbot* v. *Hudson,* 16 Gray, 417; *Salem* v. *Eastern Railroad Company,* 98 Mass. 431; *Blair* v. *Forchand,* 100 Mass. 136; *Watertown* v. *Mayo,* 109 Mass. 315.; *Young* v. *Blaisdell,* 138 Mass.· 344; *Rideout* v. *Knox,* 148 Mass. 368. .

*Mr. Samuel J. Elder,* (with whom was *Mr. Charles T. Gallagher* on the brief,) for defendant in error.

MR. JUSTICE HARLAN, after stating the case as above reported, delivered the opinion of the court.

The grounds upon which the plaintiffs impeach the validity of the sale of 1844 are: That the notice required to be given of the proceedings in the Suffolk Probate Court was not shown to have been published as often as required, and, therefore, such jurisdiction of the ward was not acquired as authorized an order for the sale of his property; that the notice of the sale did not specify both the time and place of sale; that the guardian could only sell for money in hand, and was without authority to sell and convey and immediately take, as was done, a mortgage back for the purchase money; that no return of the proceeds of sale was ever made by the guardian; and that an affidavit setting forth the time and place of the sale was not filed by the guardian within the time prescribed by the statute.

.But, obviously, the question to be first considered is whether an absolute title passed to the city of Boston. If the title passed in virtue of what was done under the act of 1867, it will become unnecessary to determine whether the sale made by the guardian of Peleg Tallman, Jun., in 1844 was invalid upon any of the grounds assigned by the plaintiffs. For, if that sale was, in itself, ineffectual to divest the title of the devisee in remainder, and if, at the time the city proceeded under the statute of 1867, the title was not, in law, in Knott or in the defendant Rechel, but in the children and widow of the devisee in remainder upon his death in 1863, the title nevertheless passed to the city, if the provisions of that statute

were followed, unless, as plaintiffs contend, the statute was unconstitutional and void.

The constitution of Massachusetts recognizes the right of each individual to be protected in his life, liberty, and property, according to standing laws; declares his obligation ·to contribute his share to the expense of such protection; and provides that "no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people." And "whenever the public exigencies require, that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." Mass. Const. Part 1, art. 10. The legislative department of the Commonwealth has, however, full power "from time to time to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes and ordinances, directions and instructions, either with penalties or without, so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof." Part 2, c. 1, art. 4.

The authority for the enactment of the statute of 1867 is found in these constitutional provisions. The territory of which the lot in controversy formed a part, was in such condition, for many years, as to require, or at least to justify, legislative interference under the power to ordain and establish wholesome and reasonable regulations conducive to the good and welfare of the people, and not inconsistent with the fundamental law of the Commonwealth. And no restrictions are imposed by the Massachusetts constitution upon the mode in which this power may be exerted, except that it is expressly required that the orders, regulations, and statutes prescribed by the legislature must not be repugnant to the constitution, and it was necessarily implied that the exercise of the power must have some real, substantial relation to the general good and welfare. But in determining whether the legislature, in a particular enactment, has passed the limits of its constitutional authority, every reasonable presumption must be indulged in

favor of the validity of such enactment. It must be regarded as valid, unless it can be clearly shown to be in conflict with the constitution. It is a well-settled rule of constitutional exposition, that if a statute may or may not be, according to circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed. *Talbot* v. *Hudson*, 16 Gray, 417, 422; *Fletcher* v. *Peck*, 6 Cranch, 87, 128; *Sinking Fund Cases*, 99 U. S. 700, 718.

We must, therefore, assume that the act of 1867 had for its real object the protection of the public health, and not the mere acquisition of the property in question for purposes of sale and profit, after it had increased in value by reason of the grade being raised. It is not alleged in the pleadings, nor was there any evidence tending to show, that the cost of raising the grade would have been so slight, compared with the real value of the property, that a due regard to the constitution demanded that the owner should have been given opportunity to raise the grade at his own expense, and retain the property in its improved condition. On the contrary, it appears that the public health justified prompt action and the use of such means as could be effectively supplied only by municipal authority acting under legislative sanction.

In *Dingley* v. *Boston*, 100 Mass. 544, 554–60, this act of 1867 was assailed upon various grounds. It was there adjudged that the statute authorized the property described in it to be taken by the city for public purposes; that its language imported a title in fee simple. The point was pressed that the legislature had assumed the power to declare the existence of a public nuisance on the land of the plaintiff, and that this was an exercise of judicial power because it charged him with an offence, and decided the question without giving him an opportunity to be heard, and then proceeded to deprive him of his land. But this point was overruled, the court holding that the statute did not regard him as an offender in any sense, because it gave him a right to compensation, not only for all damage occasioned by the taking of his land, but for its deterioration in value before the taking; that it regarded

him as an innocent person whose land was taken on the ground of public necessity in order to protect the health of the city ; and that upon the facts stated, it was apparent that no indictment would lie against him, notwithstanding the nuisance, for it had been created by the acts of others which were beyond his control, and it was not in his power to remove it.

After observing that the work specified in the act was regarded by the legislature as a great public enterprise to accomplish a highly important object, one that needed to be prosecuted by legislative authority, and which could not have been dealt with by a judicial tribunal under any known forms of proceeding, the court proceeded : " Where the sanitary condition of a large city requires an interference with the real estate of a great number of persons, making expensive and essential changes in the condition and character of the land, a case is presented within that clause of the constitution which confers authority upon the legislature to make 'all manner of wholesome and reasonable laws, so as the same be not repugnant or contrary to this constitution.' Part 2, c. 1, § 1, art. 4. In *Hingham & Quincy Bridge and Turnpike Co.* v. *County of Norfolk*, 6 Allen, 353, Bigelow, C. J., says one of the main purposes of this clause was to vest in the legislature a superintending and controlling authority, under and by virtue of which it might enact all laws not repugnant to the constitution of a police and municipal nature, and necessary to the due regulation of the internal affairs of the Commonwealth."

In the same case it was objected, that as the act authorized the city to first take the land and thereby transfer to itself the fee without the consent of the owners, and as the only object of the legislature was to abate a nuisance, the act should only have granted power to occupy the land until its object was effected by raising the grade, which being done, the land should have been restored to the owners, applying the benefit received therefrom in offset to the damages. That objection was fully met. Conceding it to be true that the raising of the grade did not require an occupation of the

land for a great length of time, and that when the work was completed the nuisance was abated, and the land in a condition to be occupied by private persons, the court said : " But its condition will be greatly changed ; almost as much as raising flats into upland. The former surface will be deeply buried under the earth that will have been brought upon it, and the changed condition is to be perpetual. If the old property is restored, the new property which has been annexed to it must go with it. This would be very unjust to the city, which has been compelled to incur the great expense of destroying the nuisance, unless the owner were required to make a reasonable compensation, which might be far beyond the amount of the damages to which he would be entitled. It would be difficult to adjust the matter; and in many cases it might operate harshly upon the owner to compel him to take and pay for the improvements. On the whole, therefore, the plan of compelling the city to take the land in fee simple, and the owner to part with his whole title for a just compensation, would seem to be the most simple and equitable that could be adopted; unless there is some objection on the ground that a fee simple is more sacred than an estate for life or years, or than an easement of greater or less duration. We can see no ground for regarding one of these titles as more sacred than another, or for regarding land as more sacred than personal property." Again : " Whether land be taken under the clause authorizing the making of wholesome and reasonable laws, or by virtue of the clause authorizing the appropriation of private property to public uses, it must in either case be left to the legislature to decide what quantity of estate ought to be taken in order to accomplish its purpose, and do the most complete justice to all parties. . . . The constitution provides for the protection of all private property, and it provides that when the public exigencies require that the property of any individual shall be appropriated to public uses, he shall receive a reasonable compensation therefor. But it leaves the legislature, without any restriction, express or implied, to decide in each case as it arises, what constitutes such exigency ; and, if land is to be taken, what estate in it shall pass."

But the validity of the act of 1867 is questioned on the ground — not suggested in *Dingley* v. *Boston* — that it did not provide for compensation to be made to the owners of the property in advance of its actual appropriation by the Commonwealth.

Upon this point the defendant insists that the statute was enacted under the authority to ordain and establish laws and regulations reasonably adapted to secure the good and welfare of the people, and that statutes, having such objects in view, which deprive individuals of the control and use. of their property; need not make provision at all for compensation to such individuals.

In support of this position reference is made to *Bancroft* v. *Cambridge*, 126 Mass. 438, 441. That case arose under a statute empowering the city of Cambridge to require the owners of certain lands to fill them to a prescribed grade in order to abate a nuisance. If the owners failed to do so, then the city was authorized to raise the grade, the expense thereby incurred to become a lien on the land filled. If any one gave due notice of his dissatisfaction with the assessment of the expense of raising the grade, the city was thereupon required to "take" the land, and, within a named time, file in the registry of deeds a description of it, together with a statement that it was taken under the statute. If the parties did not agree as to the amount of damage done by the taking, then the question of damage was to be determined by a jury, proper allowance being made for the improvement by reason of the grade of the land being raised.

The court said that the compensation to which the owner was entitled was the value of the land at the time of. the taking, making due allowance for the improvement; that this excluded loss or inconvenience caused to the owner by proceedings prior to the taking; that the purpose of the statute was to give to each owner the right to elect whether he would pay the expenses of filling his land and retain his estate, or surrender his estate to the city for a fair compensation; and that the act gave no right either to the owner who surrendered, or to the owner who did not surrender, to recover for previous

loss or inconvenience. "Nor," the court said, "is the statute made unconstitutional by this construction. It is entitled an act to provide for the prevention and abatement of nuisances and the preservation of the public health. It was not passed to delegate the right of eminent domain, but under the police power of the Commonwealth. Laws passed in the legitimate exercise of this power are not obnoxious to constitutional provisions, merely because they do not provide compensation to the individual who is inconvenienced by them. He is presumed to be rewarded by the common benefits secured. Instances of its exercise are found in all quarantine and health regulations, and in all laws for the abatement of existing and the prevention of threatened nuisances. . . . The legislature is ordinarily the proper judge of the necessity for the exercise of the power, and there is nothing in this case which shows that this act was not required for the preservation of health and protection against a nuisance."

That case does not sustain the view advanced in behalf of the present defendant. The statement, in the opinion of the court, that laws passed in the legitimate exercise of the police power are not to be held objectionable, on constitutional grounds, *merely* because they do not provide for compensation to the individual inconvenienced by them, had reference only to so much of the statute then under examination as directed, in the interest of the public health, the abatement of the nuisance created by the condition of the property in question. The abatement of a nuisance — nothing more being required or done — is not of itself, and within the meaning of the constitution, an appropriation of property to public uses. The court did not say that private property, the condition of which was such as to endanger the public health, could be legally taken by the Commonwealth *and appropriated to public use* without reasonable compensation to the owner. On the contrary, the statute there under examination contemplated that if the owner did not himself abate the nuisance in the mode prescribed, then the *property*, the condition of which was the cause of the nuisance, was to be *taken* by the city, the owner to receive such damages as a jury awarded, allowance

being made for the improvement that resulted from the raising
of the grade at the expense of the city.   That case, it is mani-
fest, proceeded upon the ground that the provisions of the
constitution above quoted are to be construed together, so that
if private property be actually taken and appropriated for
public uses, although taken or appropriated in virtue of a stat-
ute having as its main or primary object the conservation of the
public health, reasonable compensation must be made to the
owner.   This necessarily follows from the restriction imposed
by the constitution to the effect that statutes passed in the
exercise of the police power of the Commonwealth must not
be repugnant or contrary to the constitution, one of the pro-
visions of which is, that the owner of private property,
*appropriated to public uses,* shall receive a reasonable compen-
sation therefor.   And it was so appropriated when the city
took the fee, and thereby acquired a right to sell the property
after it was improved, and put the proceeds into its treasury.
*Brooklyn Park Commissioners* v. *Armstrong,* 45 N. Y. 234,
244.

Undoubtedly, the State, without taking the title to itself,
may, in some appropriate mode and without compensation to
the owner, forbid the use of specified private property, where
such use would be injurious to the public health.   For, as said
by Chief Justice Shaw in *Commonwealth* v. *Alger,* 7 Cush. 53,
84, " it is a settled principle, growing out of the nature of well-
ordered civil society, that every holder of property, however
absolute and unqualified may be his title, holds it under the
implied liability that his use of it shall be so regulated that
it be not injurious to the equal enjoyment of others having an
equal right to the enjoyment of their property, nor injurious
to the rights of the community."   " Rights of property, like
all other social and conventional rights, are subject to such
reasonable limitations in their enjoyment, as shall prevent
them from being injurious, and to such reasonable restraints
and regulations established by law, as the legislature, under
the governing and controlling power vested in them by the
constitution, may think necessary and expedient."   This, the
court said, was not the power of eminent domain, but rather

the police power, " the power vested in the legislature by the constitution, to make, ordain, and establish all manner of wholesome and reasonable laws, statutes, and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the Commonwealth and of the subjects of the same."

When, however, the legislature provides for the actual taking and appropriation of private property for public uses, its authority to enact such a regulation rests upon its right of eminent domain — a right vital to the existence and safety of government. But it is a condition precedent to the exercise of such power that the statute make provision for reasonable compensation to the owner.

The difference between an act passed with exclusive reference to the police power of the State, without any purpose to take and apply property to public uses, and a statute like the one here involved, which, for the general good, ordains and establishes regulations declaring the existence of a nuisance created by the condition of particular property, and, *in addition,* and as the best mode of accomplishing the end in view, authorizes the same property to be appropriated by the public, is illustrated by *Commonwealth* v. *Tewksbury,* 11. Met. 55, 59. That case related to a statute of Massachusetts, which, for the protection of the harbor of Boston, forbade, under penalties, the removal of any stones, gravel, or mud from any of the beaches in the town of Chelsea. The court, observing that all property was acquired and held under the tacit condition that it should not be so used as to injure the equal rights of others, or to destroy or greatly impair the public rights and interests of the community, said that " a law prohibiting an owner from removing the soil composing a natural embankment to a valuable, navigable stream, port or harbor, is not such a taking, such an interference with the right and title of the owner, as to give him a constitutional right to compensation, and to render an act unconstitutional which makes no such provision, but is a just restraint of an injurious use of the property, which the legislature have authority to make."

. The principle is· also· illustrated by the case of *Turner* v. *Nye,* 154 Mass. 579, 581, 582. That case involved the validity of a statute authorizing the flowage of certain lands or flats, upon prescribed terms and conditions, for the purpose of creating and raising a pond for the cultivation of useful fishes. Referring to the constitutional provision giving power to enact all manner of wholesome and reasonable laws for the general good, (Const. Mass. Part 2, c. 1, art. 4,) the court in that case said : "The provision above quoted does not authorize the legislature to take private property from one person and give it to another, nor to take property for public uses without compensation; nor wantonly to interfere with private rights. These are always to be carefully guarded and protected. But of necessity cases will arise where there will or may be a conflict of interests in the use or disposition of property, and questions may and will come up affecting the public welfare in regard to the use which shall or shall not be permitted of certain property." *Salem* v. *Eastern Railroad Co.,* 98 Mass. 431, 437.

But must compensation be actually made or tendered in advance of such taking or appropriation? Is it not sufficient, in order to meet the requirements of the constitution, if adequate provision be made for compensation?

The constitutions of some of the States expressly require that compensation be first made to the owner before the rights of the public can attach. But neither the constitution of Massachusetts nor the Constitution of the United States contains any such provision. The former only requires that the owner "shall receive a reasonable compensation;" the latter, that private property shall not be taken for public use "without just compensation." Reasonable compensation and just compensation mean the same thing.

In *Haverhill·Bridge·Proprietors* v. *Essex County Commissioners,* 103 Mass. 120, 124, the court said: "The duty of paying an adequate compensation, for private property taken, is inseparable from the exercise of the right of eminent domain. The act granting the power must provide for compensation, and a ready means of ascertaining the amount.

Payment need not precede the seizure; but the means for securing indemnity must be such that the owner will be put to no risk or unreasonable delay."

A leading case upon this point is *Connecticut River Railroad v. Franklin County Commissioners,* 127 Mass. 50, 52, 54, 55, 56. That case arose under a statute of Massachusetts authorizing the manager of a railroad owned by the Commonwealth to take land for a passenger station to be used by that and other railroads, and providing no other mode of compensation to the owner than that the land should be paid for out of the earnings of the railroad. The statute was held to be void.

The court said : " It has long been settled by the decisions of this court, that a statute which undertakes to appropriate private property for a public highway of any kind, without adequate provision for the payment of compensation, is unconstitutional and void, and does not justify an entry on the land of the owner without his consent" — citing among other cases *Boston & Lowell Railroad* v. *Salem & Lowell Railroad,* 2 Gray, 1, 37. Again : " Statutes taking private property for a public highway, and providing for the ascertaining of the damages, and for payment thereof out of the treasury of the county, town or city, have often been held to be constitutional. But, in the cases in which it has been so held, the liability to pay the damages rested upon the whole property of the inhabitants of the municipality, and might be enforced by writ of execution or warrant of distress, or by mandamus to compel the levy of a general tax. The rule has not been extended to cases in which only a special fund was charged with the payment of the damages, and the municipality had no power to levy a general tax to pay them." " When," the court said, " private property is taken directly by the Commonwealth for the public use, it is not necessary or usual that the Commonwealth should be made subject to compulsory process for the collection of the money to be paid by way of compensation. It is sufficient if the statute which authorizes the taking of the property should provide for the assessment of the damages in the ordinary manner, and direct that the damages so assessed be paid out of the treasury of the Com-

monwealth, and authorize the governor to draw his warrant
therefor."

Much stress was placed by counsel in that case upon the
admitted fact that the earnings of the railroad owned by the
Commonwealth would probably be sufficient to meet and
extinguish all claims for damages for lands taken. But that,
the court well said, fell short of the constitutional require-
ment that the owner of property shall have prompt and certain
compensation, without being subjected to undue risk or un-
reasonable delay.

In the later case of *Brickett* v. *Haverhill Aqueduct Co.*, 142
Mass. 394, 396, the language of the court was that "a statute
which attempts to authorize the appropriation of private
property for public uses, without making adequate provision
for compensation, is unconstitutional and void."

In view of these authorities, it is clear that as the constitu-
tion of Massachusetts does not require compensation to be first
actually made or tendered before the rights of the public, in
the property taken or applied, become complete, the require-
ments of that instrument are fully met where the statute
makes such provision for reasonable compensation as will be
adequate and certain in its results. It is equally clear that
an adequate provision is made when the statute, authorizing a
public municipal corporation to take private property for pub-
lic uses, directs the regular ascertainment, without improper
delay and in some legal mode, of the damages sustained by
the owner, and gives him an unqualified right to a judgment
for the amount of such damages which can be enforced, that
is, collected, by judicial process.

Substantially the same principles have been announced by
this court when interpreting the clause of the Constitution of
the United States that forbids the taking of private property
for public use without just compensation. In *Cherokee Nation*
v. *Southern Kansas Railway*, 135 U. S. 641, 659, it was sug-
gested that the act of Congress there involved violated the
Constitution of the United States in that it did not provide for
compensation to be made to the plaintiff before the defend-
ant entered upon lands taken for the purpose of constructing

its road over them. This objection was not sustained. The court said : " The Constitution declares that private property shall not be taken 'for public use without just compensation.' It does not provide or require that compensation shall be actually paid in advance of the occupancy of the land to be taken. But the owner is entitled to reasonable, certain, and adequate provision before his occupancy is disturbed. Whether a particular provision be sufficient to secure the compensation to which, under the Constitution, he is entitled, is sometimes a question of difficulty. In the present case, the requirements of the Constitution have, in our judgment, been fully met. The third section provides that before the railway shall be constructed through any lands proposed to be taken, full compensation shall be made to the owner for all property to be taken or damage done by reason of the construction of the road. In the event of an appeal from the finding of the referees, the company is required to pay into court double the amount of the award to abide its judgment; and, that being done, the company may enter upon the property sought to be condemned, and proceed with the construction of its road. We are of the opinion that this provision is sufficiently reasonable, certain, and adequate to secure the just compensation to which the owner is entitled. The plaintiff asks, what will be its condition, as to compensation, if, upon the trial *de novo* of the question of damages, the amount assessed in its favor should exceed the sum which may be paid into court by the defendant? This question would be more embarrassing than it is if, by the terms of the act of Congress, the title to the property appropriated passed from the owner to the defendant, when the latter — having made the required deposit in court — is authorized to enter upon the land pending the appeal, and to proceed in the construction of its road. But clearly [under the act of Congress] the title does not pass until compensation is actually made to the owner. Within the meaning of the Constitution, [and under that act,] the property, although entered upon, pending the appeal, is not taken until the compensation is ascertained in some legal mode, and being paid the title passes from the owner,"

In *Kennedy v. Indianapolis*, 103 U. S. 599, 603, cited by the plaintiffs, the controlling question was whether the owner of certain lands, taken under an Indiana statute for a public object, had been divested of his *title*. And that question depended upon the construction of the clause of the state constitution, providing " that no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Const. Indiana, 1816, art. 1, § 7. It should be here stated that the Indiana statute Rev. Stat. Indiana, 1838, p. 337, c. 55 contained no clause expressly declaring at what stage of the proceedings the owner's title should be divested. Necessarily, therefore, it was held that; under the Indiana constitution, the owner was not divested of title until he was compensated. After referring to adjudged cases in that and other States, this court, speaking by Chief Justice Waite, said : "Not to multiply cases further, it seems to us that both on principle and authority the rule is, under such a constitution as that of Indiana, that the right to enter and use the property is complete as soon as the property is actually appropriated under the authority of law for a public use, but the title does not pass from the owner without his consent until just compensation has been made to him.".

But that case by no means controverts the doctrine that the legislature may authorize a municipal corporation to take, for public use, at the outset, the absolute title to specific private property, if either the statute under which that is done, or a general statute, recognizes the absolute right of the owner, upon his property being taken, to just or reasonable compensation therefor, and makes provision, in the event of the disagreement of the parties, for the ascertainment, by suit, without unreasonable delay or risk to the owner, of the compensation to which under the constitution he is entitled, and to a judgment in his favor, enforceable against such corporation in some effective mode, so that the owner can certainly obtain the amount of such compensation. The Massachusetts statute of 1867, unlike the Indiana statute,

expressly declares that from the moment the property was taken in accordance with its provisions, the title should be vested in the city of Boston ; that the city should thereupon proceed forthwith with the work of raising the grade; and that the owner should have the right, for the prompt enforcement of which adequate provision was made, to obtain reasonable compensation for his property.

Numerous authorities have been cited which, it is supposed, are in conflict with the views we have expressed. But a careful examination will show that the cases cited are distinguishable from those to which we have referred.

In *Baltimore & Susquehanna Railroad* v. *Nesbit*, 10 How. 395, 398, 399, it was said that it was the payment or tender of the value assessed by the inquisition that gave title to a railroad company that had taken private property for its road, and, consequently, without such payment or tender, no title could pass. But it was so declared because, by the very terms of the statute, the company was entitled to the estate and interest of the owner in the land condemned *when* it paid or tendered the value so ascertained.

In *Bloodgood* v. *Mohawk & Hudson Railroad*, 18 Wend. 9, 17, 18 — which was a case of private property taken for a railroad company — Chancellor Walworth said that the payment of the damages awarded, or the deposit of the amount as prescribed, was in the nature of a condition precedent, not only to the acquisition of the legal title to the land, but also to the right to enter and take permanent possession of the land for the use of the corporation. But that was said with reference to a statute providing that upon the payment of the damages awarded, with the costs of the appraisement, or upon the deposit of the amount in a bank in a named city to the credit of the owner, of which notice should be given, the railroad company should "be deemed to be seized and possessed of the fee simple of all such land or real estate as shall have been appraised." That the chancellor did not hold to the doctrine that payment or tender of payment must in every case precede the divestiture of the owner's title, is clear from the preceding parts of his opinion. He said: "It certainly was

not the intention of the framers of the constitution to authorize the property of a citizen to be taken and actually appropriated to the use of the public, and thus to compel him to trust to the future justice of the legislature to provide him a compensation therefor. The compensation must be either ascertained and paid to him before his property is thus appropriated, *or an appropriate remedy must be provided, and upon an adequate fund;* whereby he may obtain such compensation through the medium of the courts of justice if those whose duty it is to make such compensation refuse to do so." " The public purse, or the property of the town or county upon which the assessment is to be made, may justly be considered an adequate fund. He has no such remedy, however, against the legislature to compel the passage of the necessary laws to ascertain the amount of compensation he is to receive, or the fund out of which he is to be paid."

So, in *People* v. *Hayden,* 6 Hill, 359, 361, Chief Justice Nelson said : " Although it may not be necessary, within the constitutional provision, that the amount of compensation should be actually ascertained and paid before property is thus taken, it is, I apprehend, the settled doctrine, even as it respects the State itself, that, at least, certain and ample provision must be first made by law, (except in cases of public emergency,) so that the owner can coerce payment through the judicial tribunals or otherwise without any unreasonable or unnecessary delay." See also *Brinckerhoff* v. *Wemple,* 1 Wend. 470, 471, 472; *Rogers* v. *Bradshaw,* 20 Johns. 735, 741; *Baker* v. *Johnson,* 2 Hill, 342, 347.

In *Stacey* v. *Vermont Cent. Railroad,* 27 Vermont 39, the court said that the railroad company derived no title to the condemned land nor any easement growing out of it, and acquired no right to enter upon it or exercise ownership over the same, until it paid the damages awarded to the owner, or deposited the money as prescribed by the statute. The reason given for this was that the statute expressly provided that that should be done before any right in the land accrued to the company.

The case now before us differs from all, or nearly all, of

those cited by the plaintiffs in this, that in the latter the statute, under which the property was taken, either expressly, or by necessary implication, made the payment of tender of the compensation awarded to the owner of the property appropriated to public use, a condition precedent to the acquisition of title by the party at whose instance the property was taken; whereas, in the present case, the statute vests the title in the city of Boston from, at least, the time it filed in the office of the registry of deeds a description of the lands taken by it describing them with as much certainty as is required in a common conveyance of lands, and stating that the same were taken pursuant to the provisions of the statute. As soon as they were so taken, the city — invested from that time with the title — had the right forthwith to raise the grade, and could not throw the property back upon the former owner, or compel him to pay the cost of raising the grade; and the owner became from the moment the property was taken absolutely entitled to reasonable compensation, the amount to be ascertained without undue delay, in the mode prescribed, and its payment to be assured, if necessary, by decree against the city, which could be effectively enforced.

We are of opinion that, upon both principle and authority, it was competent for the legislature, in the exercise of the police powers of the Commonwealth, and of its power to appropriate private property for public uses, to authorize the city to take the fee in the lands described in the statute, prior to making compensation, and that the provision made for compensating the owner was certain and adequate.

It results that, as a title to the lands here in question passed to the city of Boston when such lands were actually taken in the mode prescribed in the statute of 1867, the persons who were then the owners, whoever they were, had thereafter no interest in them, but were only entitled to reasonable compensation.

If the proceedings in the probate court of Suffolk County were so defective that the title of the ward was not legally divested by the sale in 1844 — upon which question it has become unnecessary, in the present case, to express any opin-

ion — nevertheless, the title passed, under the act of 1867, to the city of Boston, when, following the provisions of that statute, it took these lands. In this view, no action can be maintained by the plaintiffs to recover the land under the title of the owner as that title existed prior to the acquisition of the property by the city.

*The judgment is affirmed.*