## In re Gossett

*John M. Eakin,* for appellant.

*James Rochow,* Deputy Attorney General, for Environmental Hearing Board.

MALIN, Chairman, July 25, 1972.—This is an appeal from an order of the Department of Environmental Resources dated November 15, 1971, directing appellants to allow the department or persons designated by the department to enter their property to remove gasoline products polluting the ground water. Hearings were held on January 20, February 3, and February 10, 1972, before M. Melvin Shralow, Esq., Hearing Examiner. Appellants' request for supersedeas was granted pending final adjudication.

## FINDINGS OF FACT

1. Joseph W. Gossett, Jr., and Lucinda C. Gossett, his wife, ("appellants") are the owners of real estate known as 5130 East Trindle Road, Hampden Township, Cumberland County, Pa.

2. Appellants' land is located in an area which also contains tank farms for the storage of refined petroleum products and pipelines for the transmission of those products. The tank farms are owned by Atlantic

Richfield Company (Arco), Gulf Oil Corporation, and American Oil Company. The pipelines are owned by Atlantic Pipeline Company and Laurel Pipeline Company. The products stored in the tanks and transmitted through the pipelines are gasoline, kerosene and fuel oil.

3. In about the first week of June 1969, it was discovered that there was gasoline in the ground in the general vicinity of appellants' property. The Department of Environmental Resources ("department") immediately began an investigation to determine the source of the gasoline and the extent of the contamination.

4. Representatives of the oil companies and pipeline companies met with representatives of the department and a joint task force was set up under the direction of Wesley Gilbertson, Deputy Secretary for Environmental Protection.

5. It has been determined that the gasoline pool extends over an area of approximately one-third square mile. The source of the gasoline has not been determined and was not the subject of testimony in this record.

6. There are indications that the pool is migrating slowly into other areas.

7. The gasoline poses a severe health and safety hazard. There have been explosions and fires in homes in the area. Gasoline has leaked into basements. It has appeared on the surface of the land. Its fumes have infiltrated homes and other buildings. Several fires have broken out as a result of it. It has made the ground water in the area unfit for use by humans, wildlife and other natural life in the soils. It has killed vegetation in the area.

8. Since August of 1969 the task force has attempted

to monitor the quantity of gasoline in the ground water and to remove the gasoline by pumping.

9. The coordinator of the task force has been Richard Rhindress, a ground water geologist employed by the department. The task force has used labor supplied either by the Atlantic Richfield Company or by the Atlantic Pipeline Company. The labor has been supplied without charge to the Commonwealth.

10. The situation in general and particular incidents of explosion and fire have been investigated by the State Fire Marshal. Tests were also conducted by the Public Utilities Commission.

11. The ground water, which carries the gasoline with it, moves along fracture zones beneath the surface of the soil. The method adopted for removal of the gasoline has been to drill wells at various locations throughout the area, to monitor the wells on a regular basis to determine when gasoline appears in them, and then to pump out the gasoline and water from the well.

12. There are approximately 46 wells in the area which are monitored and pumped. One of those wells is on the property of appellants.

13. From the inception of the program to the time of the hearing, the task force had pumped out approximately 217,000 gallons of gasoline. It is not known how much remains.

14. The well on appellants' property has been one of the most productive wells. Approximately 22½ percent of the total gasoline removed from all wells has been taken from the well on appellants' property.

15. Damage to appellants' property has occurred as a result of this process. Tank trucks and other vehicles have been driven across appellants' property.

Private vehicles of the men engaged in the work also have been driven across the property.

16. Damage also has been caused by the manner in which the pumping was done. The technique had been to pump the gasoline and water mixture into the tank truck and then drain off the water onto the surface of the land. Appellants complained of this procedure and the task force then trucked away all of the liquid for drainage at another point.

17. Damage also was caused by the task force leaving the well on appellants' property uncapped. The well then overflowed at times of high water table, leaving water and gasoline on the surface of the land. This procedure also has been changed.

18. Since October 1971, appellants have denied the department and members of the task force access to the well on their property. Since that time, monitoring and pumping from that well have ceased.

19. Gasoline remains in the ground in the area and the extreme hazards to life, health and property continue. In fact, the removal of large quantities of liquid gasoline may result in increased gasoline fumes, which create an even greater hazard than the liquid.

20. The department seeks access to the well on appellants' property for the purpose of continuing the monitoring and pumping of the well.

21. It is the intention of the department to continue monitoring and pumping the well until all traces of the gasoline have been removed. No time limit has been set or estimated for accomplishing this purpose.

## DISCUSSION

It is agreed by all parties that a highly dangerous situation exists in the area in which appellants' property is located. The incidents of fire and explosion have been numerous, and the threat of additional

occurrences of this type continues. In fact, several families in the area have left their residences, apparently as a result of the properties having been purchased by the oil companies involved.

It is clear from the record that appellants have done nothing to cause this problem. They are suffering not only from the physical damage caused by the presence of the gasoline and the psychological pressures from the threat it poses to life and property, but also from the physical damage caused by access to and pumping from the well on their property.

Appellants' main contention is that the damage they have suffered is so extensive that, in effect, their property has been taken from them. They do not object to the remedial program undertaken by the Commonwealth and the oil companies, but assert that they should be paid for their property so that the program may continue. The order appealed from directs appellants to permit access to the well on their property but does not deal with the question of damages. The issues for us are whether the department has the power to issue such an order and, if so, whether the absence of a damage remedy in the order makes it invalid.

## I. The Clean Streams Law

Section 316 of the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.316, provides in pertinent part:

"Whenever the [Department of Environmental Resources]* finds that pollution or danger of pollution is resulting from a condition which exists on land in the Commonwealth the [Department] may order the

---

* These powers, originally assigned to the Sanitary Water Board, were transferred to the Department of Environmental Resources by Act of December 3, 1970, P. L. 884, sec. 20 (22), (No. 275), 71 PS §510-1(22).

landowner or occupier to correct the condition in a manner satisfactory to the [Department] or it may order such owner or occupier to allow a mine operator or other person or agency of the Commonwealth access to the land to take such action. For the purpose of this section, 'landowner' includes any person holding title to or having a proprietary interest in either surface or subsurface rights."

Section 1 of the Clean Streams Law, 35 PS §691.1, states:

" 'Pollution' shall be construed to mean contamination of any waters of the Commonwealth such as will create or is likely to create a nuisance or to render such waters harmful, detrimental or injurious to public health, safety or welfare, or to domestic, municipal, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life, including but not limited to such contamination by alteration of the physical, chemical, or biological properties of such waters, or change in temperature, taste, color or odor thereof, or the discharge of any liquid, gaseous, radioactive, solid or other substances into such waters. The [Department] shall determine when a discharge constitutes pollution, as herein defined, and shall establish standards whereby and wherefrom it can be ascertained and determined whether any such discharge does or does not constitute pollution as herein defined.

" . . .

" 'Waters of the Commonwealth' shall be construed to include any and all rivers, streams, creeks, rivulets, impoundments, ditches, water courses, storm sewers, lakes, dammed water, ponds, springs and all other bodies or channels of conveyance of surface and underground water, or parts thereof, whether natural

or artificial, within or on the boundaries of this Commonwealth."

In its order of November 15, 1972, the department found that the ground water in the area which includes appellants' property "is polluted by gasoline products, which pollution has previously resulted in, and presently threatens, explosions, fires and serious property damage to occupied structures in the area," and declared such pollution to be a nuisance and a clear and immediate danger to public health, safety and welfare. The evidence establishes that such pollution did exist within the waters of the Commonwealth and continues to so exist.

Appellants argue that section 316 requires the existence of a condition which causes pollution and that this condition may not be the existence of the pollutant or contaminant itself. In other words, it is appellants' position that before the department may utilize the remedies provided in section 316, there must exist some agency or activity which produces pollution, and that these remedies are not available with respect to a landowner when the only thing that exists on or under his land is the pollution itself. The department, on the other hand, argues that the pollutant or contaminant itself may constitute the condition which justifies remedies under section 316.

The language of the statute does not address itself specifically to the issue thus raised. Therefore, we must interpret the statute and, in doing so, we are enjoined "to ascertain and effectuate the intention of the Legislature": Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 51, 46 PS §551. That section also states:

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters—(1) the occasion and

necessity for the law; (2) the circumstances under which it was enacted; (3) the mischief to be remedied; (4) the object to be attained; (5) the former law, if any, including other laws upon the same or similar subjects; (6) the consequences of a particular interpretation; (7) the contemporaneous legislative history; and (8) legislative and administrative interpretations of such law."

Many of the indications which we are directed to seek are provided in section 4 of the Clean Streams Law of June 22, 1937, P. L. 1987, sec. 4, 35 PS §691.4, which declares the policy of the legislature in adopting the act:

"(1) Clean, unpolluted streams are absolutely essential if Pennsylvania is to attract new manufacturing industries and to develop Pennsylvania's full share of the tourist industry;

"(2) Clean, unpolluted water is absolutely essential if Pennsylvanians are to have adequate out of door recreational facilities in the decades ahead;

"(3) It is the objective of the Clean Streams Law not only to prevent further pollution of the waters of the Commonwealth, but also to reclaim and restore to a clean, unpolluted condition every stream in Pennsylvania that is presently polluted;

"(4) The prevention and elimination of water pollution is recognized as being directly related to the economic future of the Commonwealth; and

"(5) The achievement of the objective herein set forth requires a comprehensive program of watershed management and control."

It is particularly helpful to measure the consequences of the particular interpretation urged by appellants against the mischief to be remedied and the object to be attained by this legislation as stated in the declaration of policy. It is stated that clean,

unpolluted water is essential and that the object of the law is not only to prevent further pollution, but also to eliminate existing water pollution. The result of appellants' view of the law would deprive the Commonwealth of a major tool in combating and eliminating pollution in one of the circumstances where that tool is most needed, namely where the condition of pollution is found to be in existence on or under land of a party who has not created that pollution. Such a construction of section 316 would not effectuate the stated intention of the legislature, but would contradict it. Permitting the department to take the action requested here will further the legislative purpose of reducing the very great harm and substantial danger to the public health, safety and welfare created by the water pollution presently existing.

A finding that section 316 authorizes the Commonwealth to order that access to land may be granted under appropriate circumstances need not and does not carry with it a determination that all of the remedies under section 316 may be assessed against an innocent landowner. For instance, it has been held that an action in equity to abate a public nuisance will not lie against a party who does not own or control the land where contamination originates nor control any of the agencies causing or contributing to the alleged nuisance: Molino v. Hoban, 72 Montg. 178 (C. P. 1955).

The facts in this case are analogous to those in the case of McCabe v. Watt, 224 Pa. 253, 73 Atl. 453, and 224 Pa. 259, 73 Atl. 455 (1909). In that case, a small mine fire spread until it threatened a major portion of Carbondale. Mandatory injunctions to fight the fire were sought against the mine operator and the owner of the surface property. In the opinion, 224 Pa. 253, the Supreme Court refused to grant an injunction

against the mine operator on the equitable grounds that the operator had exhausted all of its assets in fighting the fire and the situation was now one to be dealt with by the entire community. More in point is the opinion at 224 Pa. 259, which deals with the attempt to obtain an injunction against the surface owner. It was held that there was no right to an injunction against the owner, since he did not start the fire and was in no way responsible for its burning. The court stated that the owner owed no duty to plaintiffs in that case except that in the use and enjoyment of his own property he must not willfully and wantonly do injury to his neighbors. Nothing in his conduct brought him within the rule of willful and wanton negligence, and the same may be said of appellants in our case. The language of the court in describing what action should have been taken is particularly pertinent:

"If the lives and property of the citizens of Carbondale are menaced by the burning coal mine and the efforts of the owner are unavailing to extinguish the fire, the municipality should take hold of the situation with a strong hand and abate the so-called nuisance just as it would stop the flames of a surface conflagration. The right to protect in such an emergency is not limited by the location of the destructive agency, and the power of the municipality to act is the same whether the fire is in the cellar, or upon the roof, or above or below the surface of the ground. This fire has reached the public enemy stage, and it should be so regarded and treated by the public authorities. To hold that a state or county or other municipal division, each or all of them, cannot provide protection to the lives and property of citizens threatened with destruction by fire, would be to place the seal of impotency on governmental functions, and to deny that protection

the law should afford an enlightened people. To fiddle on broken strings while Rome is burning is not in keeping with the spirit and purpose of the present generation."

The action taken by the department in this case is in keeping with the above statement. The gasoline pollution is being treated as a public danger which the department and the oil companies are trying to combat. Financial responsibility has not been assigned to appellants, and their status as innocent victims is not challenged. But in order to fight this dangerous condition, the department and those working with it must have prompt and continuing access to the gasoline pool. Since appellants' well has proven to be the major means of this access, it is not unreasonable to require that such access be made available.

The remedy which the department has sought in this case is appropriate under the facts, is consistent with the language of the Clean Streams Law, will effectuate the purposes of the Clean Streams Law and, therefore, we hold that it is authorized by that legislation.

## II. Compensation for Injury to Appellants' Property

The department and appellants have submitted briefs which argue, respectively, that the invasion of appellants' land by the task force constitutes an exercise of the police power for which compensation need not be made, and that this incursion and the ensuing damage are of such a nature as to amount to a taking which requires the exercise of the powers of eminent domain and payment of fair compensation. Thus framed, the arguments of both parties require us to decide whether the damages suffered by appellants must be compensated for by the department as a precondition to re-entering appellants' land.

It has been held that there is no right at common law to recover damages for property destroyed in order to stop the spread of a public disaster. In Bowditch v. Boston, 101 U.S. 16 (1879), the Supreme Court of the United States denied recovery to an owner whose house was blown up in order to prevent the spread of a fire. The right to destroy private property is a limited one, and the validity of the destruction may be tested by an action against the public officials ordering it. See Annotation, Constitutional rights of owner as against destruction of building by public authorities: 14 A.L.R.2d 73 (1950). Both parties cite Pennsylvania Coal Co. v. Mahon, 260 U.S. 393 (1922), for the proposition that there is a point, not clearly defined, when the extent of damage to property is such that a taking has occurred and compensation must be paid. The dispute is whether that point has been reached in this case. We hold that issue need not be decided by us.

The issue of the power and authority of the department to take the action embodied in the order of November 15, 1971, is separable from the issues of whether that action constitutes a taking and/or whether compensation must be paid to appellants for the injuries they have suffered. In Sweet v. Rechel, 159 U.S. 380 (1895), the Supreme Court held that the constitutional requirement of fair compensation for property taken is satisfied so long as the law makes adequate provision for compensation. Just compensation need not be paid in advance of the taking. The provision for compensation may be made under the same statute which authorizes the taking or under a general statute. We find that holding applicable to this case.

Pennsylvania law has recognized the right of a landowner to compensation for property taken for a public purpose by public officials even though no formal

declaration of taking has been made. See Griggs v. Allegheny County, 402 Pa. 411, 168 A. 2d 123 (1961), reversed on other grounds, 369 U.S. 84 (1962). That right has been preserved in the Eminent Domain Code of June 22, 1964, Special Sess., sec. 502(e), 26 PS §1-502(e). Therefore, Pennsylvania law does make provision for an action whereby appellants may claim their property has been taken and seek just compensation for it. The issue of the right to compensation may be litigated fully in such an action. This fulfills the constitutional requirement of provision for just compensation and the order of November 15, 1971, is not invalid for having failed to award damages or compensation to appellants. The power to enter the land in response to an emergency is not conditioned on a determination of the right to damages for that entry.

### III. Protection of Appellants

Appellants' position is one for which we have great sympathy. They are suffering hardships through no fault of their own. Extensive investigations by the department, five oil and pipeline companies, the State Fire Marshall and the Public Utilities Commission have thus far failed to fix responsibility for the highly dangerous conditions which exist. This makes it clear that appellants have a very difficult task if they wish to fix responsibility on a private party for the damages they have suffered. In terms of public responsibility for the damages sustained, we cannot pass on what will be the results of a petition under the Eminent Domain Code and, therefore, this remedy also is an uncertain one for appellants.

The highly dangerous and harmful conditions which exist in the area make it crucial to the public interest that remedial steps be continued without interference. On the other hand, every reasonable

precaution must be taken to guard against unnecessary damage to appellants' property in the course of dealing with the public hazard. Therefore, the department's order must be modified to provide such safeguards.

## CONCLUSIONS OF LAW

1. Pollution and the danger of pollution exists on and under appellants' land and results from a condition which exists on and under that land within the meaning of section 316 of the Clean Streams Law.

2. The Department of Environmental Resources is authorized by section 316 of the Clean Streams Law to order appellants to allow access to the land by the Commonwealth and its authorized agents for the purpose of correcting the condition.

3. The monitoring and pumping of the well on appellants' property is a proper and necessary action for the purpose of dealing with and attempting to correct the dangerous condition existing.

## ORDER

1. Joseph W. Gossett, Jr., and Lucinda C. Gossett, his wife, shall allow persons designated by the Department of Environmental Resources in accordance with the terms of this order to enter their property at 5130 East Trindle Road, Hampden Township, Cumberland County, for the purposes herein set forth.

2. The department shall designate in writing a maximum of three persons, employed by the department, at least one of whom shall be present on all occasions of entry upon the Gossett property and shall supervise all other persons participating in such entry.

3. No more than five persons shall enter the Gossett property at any one time to perform work in accordance with this order without prior approval of Mr. and Mrs. Gossett or further order of this board. The

names of all persons entering the land pursuant to this order and their employers at the time of entry shall be furnished to the Gossetts upon request.

4. Entry to the land shall take place no more than two days per week to monitor the thickness of gasoline on the groundwater unless findings of gasoline establish that more frequent monitoring is necessary. The Gossetts shall be given a schedule of the days of the week and times at which such monitoring will take place, and shall be given 24 hours prior notice of monitoring beyond the two days per week scheduled. Such monitoring shall be done by a maximum of two persons without the aid of vehicles.

5. When the results of monitoring indicate that it is necessary to pump the well, a mechanical or electrical pump may be placed within the well and the pumped liquid shall be placed in a tank truck and removed from the Gossett property. A maximum of two trucks necessary to transport persons and equipment may be utilized in addition to the tank truck. If an electrical pump is used, a small gasoline powered generator may be parked near the well. Access to the well shall be by any reasonable route designated in writing by the Gossetts. In the absence of such designation, the department shall designate a route reasonably calculated to reduce injury to the property to a practical minimum. If requested by the Gossetts, the department shall apply crushed stone to the access route to prevent ruts from forming.

6. All actions taken by the department and persons under their supervision on the Gossett property shall be done in a way so as to reduce to a practical minimum physical damage to the property and inconvenience and annoyance to Mr. and Mrs. Gossett.

7. Unless terminated earlier by the department, authority to enter the Gossett property pursuant to

this order shall terminate nine months from the date hereof, following which the department shall re-evaluate the situation as it then exists and may make such new order as it determines to be appropriate. Any such new or additional orders by the department shall not be determined by this adjudication and nothing herein shall prejudice the rights of the Gossetts to appeal from such orders.