**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, a body corporate, Appellee,**

v.

**ONE PARCEL OF LAND In MONTGOMERY COUNTY, MARYLAND, et al., and Unknown Owners, (parcel MA 408) and F.O. Day Company, Defendants,**

**and**

**Virginia Casey Visnich, Appellant.**

No. 82–1166.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 8, 1983.

Decided May 4, 1983.

John R. Clapp, Rockville, Md. (R. Edwin Brown, Brown & Sturm, Rockville, Md., on brief) and Warren Browning, for appellant.

J. Carol Williams, Dept. of Justice, Washington, D.C. (Carol E. Dinkins, Asst. Atty. Gen., Raymond N. Zagone, Robert L. Klarquist, Robert H. Plotkin, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, WIDENER, Circuit Judge, and BRYAN, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Virginia Casey Visnich appeals from the judgment of the district court ruling that the Washington Metropolitan Area Transit Authority ("WMATA") acted properly in condemning her property under the Declaration of Taking Act, 40 U.S.C. § 258a, and setting an award of interest on the amount of just compensation. We conclude that WMATA properly exercised condemnation powers delegated to it by the federal government, and that the district court acted within its discretion in fixing the rate of interest on the award. We therefore affirm the judgment.

## I.

In order to provide for the development of a coordinated mass transit system in the Washington, D.C. metropolitan area, the District of Columbia, Maryland, and Virginia, at the urging of Congress,[1] negotiated the Washington Metropolitan Area Transit Authority Compact ("Compact").[2] The Compact was enacted into state law by Maryland, see Ch. 869, Acts of General Assembly 1965, and Virginia, see Ch. 2, 1966 Acts of Assembly. Congress then enacted the compact for the District of Columbia. See Pub.L. No. 89–774, 80 Stat. 1324 (1966), reprinted at [1966] U.S.Code Cong. & Ad. News 1547–79.[3] That enactment also constituted congressional consent to the Compact, pursuant to the Compact Clause of the United States Constitution, which provides that "[n]o State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State ...." U.S. Const. art. I, § 10, cl. 3.

Section 4 of the Compact created WMATA as an instrumentality and agency of each of the signatory parties—the District of Columbia, Maryland, and Virginia. Its Board of Directors is composed of two representatives from each of the signatories. As set forth in the Compact, WMATA's purposes are "to plan, develop, finance, and cause to be operated improved transit facilities, in coordination with transportation and general development planning for the [metropolitan] Zone, as part of a balanced regional system of transportation." In carrying out those purposes, WMATA has, among others, the power to sue and be sued and to acquire, own, and convey real and personal property necessary or useful in rendering transit service. Although most of its funds are supposed to come from operating revenues, WMATA is empowered to issue revenue bonds, borrow money from lending institutions, and mortgage or pledge its properties and revenues; remaining funding may be provided by the states, District, and federal government. WMATA is not permitted however, to acquire any property, make any commitments, or incur any obligations unless funds are presently available to cover such expenses.

Of particular relevance to the present case, the Compact also establishes and defines the Authority's powers of property condemnation. Section 82 of the Compact provides:

(a) The Authority shall have the power to acquire by condemnation ... any real or personal property ....

(b) Proceedings for the condemnation of property in the District of Columbia shall be instituted and maintained under the Act of December 23, 1963 (77 Stat. 577–581, D.C.Code 1961, Supp. IV, Sections 1351–1368). Proceedings for the

---

1. See National Capital Transportation Act of 1960 § 301(a), 74 Stat. 537 (1960) (intention "to promote and encourage the solution of problems of a regional character in the National Capital region by means of an interstate compact entered into by the State of Maryland, the Commonwealth of Virginia and the Board of Commissioners of the District of Columbia, with the consent of Congress"). A federal representative attended the negotiations. See H.R.Rep. No. 1914, 89th Cong., 2d Sess. 4 (1966).

2. The WMATA Compact was actually an amendment to the Washington Metropolitan Area Transit Regulation Compact, previously enacted by the participants and consented to by Congress. See Pub.L. No. 86–794, 74 Stat. 1031 (1960), as amended by Pub.L. No. 87–767, 76 Stat. 764 (1962).

3. The bill was, after approval by both Houses of Congress, signed by the President.

condemnation of property located elsewhere within the Zone shall be instituted and maintained, if applicable, pursuant to the provisions of the Act of August 1, 1888, as amended (25 Stat. 357, 40 U.S.C. 257) and the Act of June 25, 1948 (62 Stat. 935 and 937, 28 U.S.C. 1358 and 1403) or any other applicable Act; provided, however, that if there is no applicable Federal law, condemnation proceedings shall be in accordance with the provisions of the State law of the signatory in which the property is located governing condemnation by the highway agency of such state . . . .

(c) Any award or compensation for the taking of property pursuant to this Title shall be paid by the Authority, and none of the signatory parties nor any other agency, instrumentality or political subdivision thereof shall be liable for such award or compensation.

## II.

On May 12, 1978, WMATA filed a complaint and declaration of taking in the district court, condemning certain property, located in Montgomery County, Maryland, owned by appellant Virginia Casey Visnich. WMATA purported to proceed under the "quick-take" condemnation procedures specified by 40 U.S.C. § 258a, the Declaration of Taking Act.[4] Pursuant to those procedures, WMATA deposited into the registry of the court its estimate of the property's value, $1,710,400, and took immediate title to, and possession of, the property.[5]

On March 19, 1979, the owner filed a motion to vacate the declaration of taking

---

4. The full text of § 258a follows:

In any proceeding in any court of the United States outside of the District of Columbia which has been or may be instituted by and in the name of and under the authority of the United States for the acquisition of any land or easement or right of way in land for the public use, the petitioner may file in the cause, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that said lands are thereby taken for the use of the United States. Said declaration of taking shall contain or have annexed thereto—

(1) A statement of the authority under which and the public use for which said lands are taken.

(2) A description of the lands taken sufficient for the identification thereof.

(3) A statement of the estate or interest in said lands taken for said public use.

(4) A plan showing the lands taken.

(5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the land taken.

Upon the filing said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum on the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much thereof as shall have been paid into the court. No sum so paid into the court shall be charged with commissions or poundage.

Upon the application of the parties in interest, the court may order that the money deposited in the court, or any part thereof, be paid forthwith for or on account of the just compensation to be awarded in said proceeding. If the compensation finally awarded in respect of said lands, or any parcel thereof, shall exceed the amount of the money so received by any person entitled, the court shall enter judgment against the United States for the amount of the deficiency.

Upon the filing of a declaration of taking, the court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner. The court shall have power to make such orders in respect of encumbrances, liens, rents, taxes, assessments, insurance, and other charges, if any, as shall be just and equitable.

5. Such a procedure was also followed in *WMATA v. One Parcel of Land, No. HM 77–1306* (D.Md. filed April 7, 1978), (unpublished) *aff'd,* 599 F.2d 1050 (4 Cir.1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 754 (1980).

and for return of the property, arguing that WMATA did not have the authority to quick-take property under § 258a, but instead could take title to and possession of the property only after payment of judicially-determined just compensation. The magistrate denied this motion, and his denial was affirmed by the district court, 490 F.Supp. 1328. The case was then referred to a Land Commission, pursuant to Fed.R. Civ.P. 71A, in order to fix an award of just compensation. In its report of May 29, 1981, the Commission recommended that Visnich be awarded $4,997,203 as just compensation for the value of her property at the time it had been taken. This recommendation was adopted by the district court, leaving a shortfall of $3,286,803 between the amount that WMATA had deposited into court at the time of the taking and the amount awarded by the district court. Visnich petitioned the district court for an award of interest on this amount in excess of the nominal six percent annual rate established by § 258a. The magistrate fixed the interest rate at 8.73% for 1978, 9.63% for 1979, 11.94% for 1980, and 14.02% for 1981; this too was affirmed by the district court, and final judgment was entered.

On appeal before us, Visnich argues, first, that WMATA did not have the authority to quick-take her property under § 258a, and, second, that the interest rate set by the district court was insufficient to provide just compensation.

### III.

 We turn first to the propriety of WMATA's use of quick-take condemnation procedures. Not being a sovereign, WMATA of course has no inherent condemnation powers of its own.[6] It is also clear, however, that the federal or state governments may delegate their condemnation power to lesser agencies such as WMATA.[7] The landowner's argument, therefore, is that any delegation of condemnation powers to

WMATA was limited to normal (i.e., taking title and possession only after payment of the judicially-determined amount) condemnation, and did not include quick-take powers.

The parties seem to agree that quick-take condemnation power could not have been granted by Maryland, because the Maryland state constitution provides that:

> The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, as agreed upon between the parties, or awarded by a Jury, being paid first or tendered to the party entitled to such compensation.

Md. Const. art. III, § 40. Although article III, section 40B of the Maryland Constitution permits the State Roads Commission to use quick-take powers, such use is limited to condemnation "for highway purposes."

The magistrate and district court concluded, however, that WMATA had been delegated quick-take condemnation powers by the federal government. They reasoned that congressional consent to the WMATA Compact, pursuant to the Compact Clause, had transformed the Compact into substantive federal law that delegated federal quick-take powers to WMATA. In reviewing this judgment, we must consider: first, did the Compact become a federal law; second, if so, was it intended by Congress to delegate affirmative federal powers and was it a proper legislative device to accomplish that purpose; and third, if so, were those powers intended by Congress to include quick-take condemnation powers and were they delegated in a way that constitutionally reached that result?

### A.

 The first question is whether congressional consent pursuant to the Compact Clause created federal law, which of course would be a prerequisite to the delegation of federal power, or instead simply consented

---

6. See 1 Nichols on Eminent Domain §§ 1–14 (rev. 3d ed. 1981).

7. See id. §§ 3.1[2], 3.21; *Oakland Club v. South Carolina Public Service Authority,* 110 F.2d 84 (4 Cir.1940) (federal condemnation power delegated to state agency).

to a joining of state power. Resolution of this question is guided, we think, by the Supreme Court's recent decision in *Cuyler v. Adams*, 449 U.S. 433, 101 S.Ct. 703, 66 L.Ed.2d 641 (1981), announced after the decision of the district court. In *Cuyler*, a Pennsylvania state court had interpreted the Interstate Agreement on Detainers, an interstate compact consented to by Congress, as providing no right to a pretransfer hearing. The question presented to the Supreme Court was whether federal courts were bound by that interpretation because the state court had interpreted state law, or whether they could give their own interpretations because congressional consent to the Agreement had transformed it into federal law. The Court held that the test for whether an interstate compact becomes federal law is whether it "is a congressionally sanctioned interstate compact within Art. I, § 10, of the Constitution." *Id.* at 439, 101 S.Ct. at 707. Not all interstate agreements require congressional consent, however; "[w]here an agreement is not 'directed to the formation of any combination tending to the increase of political power in the States, which may encroach upon or interfere with the just supremacy of the United States,' it does not fall within the scope of the Clause and will not be invalidated for lack of congressional consent." *Id.* at 440, 101 S.Ct. at 707. Nor will a compact become federal law simply because Congress, in an excess of caution, enacts consent legislation.[8] "But where Congress has authorized the States to enter into a cooperative agreement, and where the subject matter of that agreement is an appropriate subject for congressional legislation,[9] the consent of Congress transforms the States' agreement into federal law under the Compact Clause." *Id.* Applying this two-part test, the Court found that Congress had passed the Crime Control Consent Act of 1934, giving its consent to an interstate compact in this area, and that Congress had the power to legislate in this area, under both the Commerce Clause and the Extradition Clause. Therefore, the Agreement "is a congressionally sanctioned interstate compact the interpretation of which presents a question of federal law." *Id.* at 442, 101 S.Ct. at 708.

Applying the *Cuyler* test here, there is, of course, no dispute that Congress enacted a law consenting to the WMATA Compact. *See* Pub.L. No. 89–774, 80 Stat. 1324 (1966), *reprinted at* [1966] U.S.Code Cong. & Ad.News 1547–79. Nor can there be any doubt that this was an appropriate area for federal legislation.[10] WMATA is charged with developing and operating a mass transit system for the District of Columbia and the surrounding Maryland and Virginia suburbs. As such, WMATA's activities have a substantial impact on interstate commerce and are appropriate for congressional legislation under the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. In addition, WMATA's powers to construct and operate a mass transit system primarily located in the District of Columbia undoubtedly fall within congressional jurisdiction to

---

**8.** *See United States Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 471, 98 S.Ct. 799, 811, 54 L.Ed.2d 682 (1978) (the "historical practice" of submitting multistate agreements "for congressional approval . . ., which may simply reflect considerations of caution and convenience on the part of the submitting States, is not controlling").

**9.** We note that there is an area of overlap where both of these tests will be met: state agreements whose subject matter is appropriate for federal legislation but which do not threaten to increase the political power of the states at the expense of the federal government. Within this area, apparently, a compact that does not receive congressional consent will not be invalidated for lack of consent, but a

compact that is consented to by Congress will thereby become federal law.

**10.** The landowner argues that the test to be applied is whether the Compact tends to increase the political power of the states at the expense of the federal government. As noted above, *supra* note 9, the Supreme Court held in *Cuyler*, 449 U.S. at 440, 101 S.Ct. at 707, that the issue of whether an interstate compact becomes federal law is resolved by determining whether it was consented to by Congress and whether its subject matter is an appropriate subject for congressional legislation. The "political power" test is limited to determining whether compacts not consented to by Congress are invalid for lack of that consent.

legislate for the District of Columbia, U.S. Const. art. I, § 8, cl. 17.[11] We conclude, therefore, that the two-part test from *Cuyler* is satisfied here, and that the WMATA Compact became federal law when consented to by Congress.

#### B.

■ The second sequential question is whether the Compact, as federal law, was intended by Congress to delegate any affirmative federal condemnation power and was a proper legislative means to accomplish that purpose. As to the first half of this question, the language of § 82(b) of the WMATA Compact explicitly evidences a congressional intent that federal condemnation powers be employed by WMATA: condemnation proceedings in Maryland and Virginia are to be instituted in federal court pursuant to 40 U.S.C. § 257 or "any other applicable Act." Section 257 authorizes condemnation proceedings by the United States whereby title and possession of the property are taken after the payment of judicially determined just compensation; the Compact thus explicitly reveals the intent of Congress, in consenting to the Compact, that at least some federal condemnation powers be delegated to WMATA.

As to the second half of this question, the landowner suggests that, as a matter of constitutional law, congressional consent transforms an interstate compact into federal law for purposes of interpretation only, and not to the extent of delegating through the compact affirmative federal powers. She argues that *Cuyler* and its predecessors merely recognized that interstate compacts must be subject to federal interpretation because there will be no neutral state forum for interpreting the compact; questions regarding the compact's meaning and the states' obligations thereunder are likely to arise only in the signatory states, and

therefore a disinterested federal forum is necessary for a resolution to which all signatories must accede.[12] *See West Virginia ex rel. Dyer v. Sims*, 341 U.S. 22, 28, 71 S.Ct. 557, 560, 95 L.Ed. 713 (1951). Visnich argues that the Supreme Court's recognition of the necessity of a neutral interpretation binding on the signatory states does not justify the further step of finding that an interstate compact is substantive federal law that, simply by the fact of congressional consent, can delegate federal powers.

We think, however, that the Supreme Court's opinions in this area do far more than the landowner would admit. First, in *Cuyler* itself, the Court held that the Interstate Agreement on Detainers is substantive federal law whose violation may be remedied by an action under 42 U.S.C. § 1983. *See* 449 U.S. at 450, 101 S.Ct. at 712. Analogously, this Circuit has previously held that the Interstate Agreement on Detainers should be considered a law of the United States whose violation is grounds for habeas corpus relief under 28 U.S.C. § 2254. *See Bush v. Muncy*, 659 F.2d 402, 407 (4 Cir.1981), *cert. denied*, 455 U.S. 910, 102 S.Ct. 1259, 71 L.Ed.2d 449 (1982). Second, the Court has held that a federal forum and federal injunctive powers will be available to enforce an interstate compact. In *Pennsylvania v. The Wheeling and Belmont Bridge Co.*, 54 U.S. (13 How.) 518, 14 L.Ed.2d 249 (1852), Pennsylvania sued a Virginia company building a bridge over the Ohio River, seeking to enjoin construction as a nuisance. The company defended on the ground that the bridge had been authorized by the Virginia legislature, and that no federal law overrode that state enactment. But the Supreme Court rejected this contention, holding that the Virginia-Kentucky Compact of 1789, which as consented to by Congress agreed that the use and navigation of the Ohio River would remain free and open to all, had become

11. The mere fact of participation by the District of Columbia in an interstate compact, however, is not enough to transform the compact into federal law: the District's participation in the compact at issue in *Cuyler* was not cited by the Court as a factor in its decision.

12. Such compliance is mandated, of course, by the Supremacy Clause, once the compact is ruled a law of the United States. U.S. Const. art. VI.

binding federal law which a state could not disobey. *Id.* at 565–66, 14 L.Ed.2d 249. Therefore, a federal remedy existed for violation of the compact. *Id.*[13] Third, the Court has held that a state court cannot declare an interstate compact to be invalid on state constitutional grounds without subjecting that normally unreviewable decision of state law to further Supreme Court review in order to protect the federal interest and the interests of the other signatories. *See West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951).

■ These cases suggest that congressionally sanctioned interstate compacts implicate federal and interstate interests, in whose furtherance and protection federal remedial powers will be available and inconsistent state laws will be deemed unenforceable. It is true that no prior case goes so far as to hold that consent may constitute delegation of federal power to the authority created by the compact. But, in the present case, there is a clear federal and interstate interest in WMATA's ability to use quick-take condemnation powers. Were construction to be commenced only after entry of a final judgment fixing an award of just compensation, the goal of rapid and coordinated development of a mass transit system would be frustrated. Moreover, as discussed above, the plain language of § 82(c) of the Compact shows that Congress knew, and intended, that federal condemnation powers and procedures would be used by WMATA. We see no reason why this intent should be frustrated simply

because it is expressed in consent legislation rather than in an "affirmative" Act; each requires a majority vote of both houses of Congress and the signature of the President. We conclude, therefore, that congressional consent to the WMATA Compact should be deemed to have delegated federal condemnation powers.

## C.

■ The third sequential question is whether the delegation of federal condemnation powers to WMATA was intended to include quick-take condemnation, and whether the quick-take scheme thus delegated satisfied the "just compensation" clause. We think that by including WMATA's right to proceed under "any other applicable Act" in addition to 40 U.S.C. § 257, Congress intended to delegate quick-take powers to WMATA.[14] This interpretation is strongly suggested by the stated congressional goal of rapid and coordinated development and construction of the transit system. *See* [1966] U.S.Code Cong. & Ad. News 1547. Moreover, interpreting the phrase to mean quick-take condemnation under § 258a is the most logical way to give meaning to that phrase.[15]

As to whether the quick-take powers delegated to WMATA satisfy the constitutional requirement of just compensation, the landowner contends that because under § 82(c) of the Compact neither the federal government nor any state has pledged its good faith and credit to the payment of the eventual just compensation award, and lia-

---

**13.** *See also League to Save Lake Tahoe v. Tahoe Regional Planning Agency,* 507 F.2d 517 (9 Cir.1974) (federal district court has jurisdiction over case requesting issuance of injunction to comply with an interstate compact), *cert. denied,* 420 U.S. 974, 95 S.Ct. 1398, 43 L.Ed.2d 654 (1975).

**14.** *See also Washington Metropolitan Area Transit Authority v. Goldman,* No. HM 77–1306 (D.Md. filed Apr. 7, 1978) (also reaching this conclusion), *aff'd,* 599 F.2d 1050 (4 Cir.1979) (unpublished), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 754 (1980).

**15.** This is so because the Compact indicates that proceedings are to be filed under § 257 "or any other applicable Act"; § 258a, the quick-

take provision, is the other principal procedural mechanism for federal condemnations.

Visnich contends that § 258a should not be implied because that section applies only to proceedings instituted "by and in the name of and under the authority of the United States." This objection is dispelled by section 4 of the consent legislation, *see* [1966] U.S.Code Cong. & Ad.News 1579, which states that "[a]ll laws or parts of laws of the United States and the District of Columbia inconsistent with the provisions of Title III of this Act are hereby amended for the purpose of this Act to the extent necessary to eliminate such inconsistencies and to carry out the provisions of this Act."

bility is limited to WMATA itself, there is no constitutionally adequate just compensation.

In *Sweet v. Rechel*, 159 U.S. 380, 16 S.Ct. 43, 43 L.Ed.2d 188 (1895), the Supreme Court first addressed the question of under what (if any) conditions a state may, consistent with the just compensation clause of the federal constitution, exercise state quick-take condemnation powers. In resolving this question, the Court quoted from *Bloodgood v. Mohawk & H.R. Co.*, 18 Wend. 9, 31 Am.Sec. 313, in which the Chancellor had written:

> It certainly was not the intention of the framers of the constitution to authorize the property of a citizen to be taken and actually appropriated to the use of the public, and thus to compel him to trust to the future justice of the legislature to provide him a compensation therefor. The compensation must be either ascertained and paid to him before his property is thus appropriated, or an appropriate remedy must be provided, and on an appropriate fund; whereby he may obtain such compensation through the medium of the courts of justice if those whose duty it is to make such compensation refuse to do so. . . . The public purse, or the property of the town or county upon which the assessment is to be made, may justly be considered an adequate fund.

159 U.S. at 405–06; 16 S.Ct. at 50–51. Turning to the case before it, the Court noted that the state law provided that "payment [is] assured, if necessary, by a decree against the city which would be effectively enforced," *id.* at 407, 16 S.Ct. at 51; this, said the Court, was "certain and adequate." *Id.*

The Supreme Court returned to this question in *Crozier v. Fried. Krupp Aktiengesellschaft*, 224 U.S. 290, 32 S.Ct. 488, 56 L.Ed. 771 (1912), in the context of whether the government could quick-take licenses on patented items. The standard applied by the Court was:

> always having reference to the nature and character of the property taken, its value and the surrounding circumstances, the duty to provide for the payment of compensation may be adequately fulfilled by an assumption on the part of the government of the duty to make prompt payment of the ascertained compensation, —that is, by the pledge, either expressly or by necessary implication, of the public good faith and credit.

*Id.* at 306, 32 S.Ct. at 492. The Court upheld the license-taking statute, as it provided for the "pledge of good faith of the government . . . to appropriate and pay the compensation when ascertained." *Id.* at 307, 32 S.Ct. at 492.

The final Supreme Court pronouncement in this area was *Joslin Mfg. Co. v. Providence*, 262 U.S. 668, 43 S.Ct. 684, 67 L.Ed. 1167 (1923), wherein a municipal water control board had quick-taken land to expand the water supply. The Court defined its test for quick-takes:

> It has long been settled that the taking of property for public use by a state or one of its municipalities need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when the public faith and credit are pledged to a reasonably prompt ascertainment and payment, and there is adequate provision for enforcing the pledge.

*Id.* at 677, 43 S.Ct. at 688. Because the Rhode Island statute provided that the landowner could have execution of any judgment issued against the city, the Court upheld the taking. We note as well that the continuing vitality of these standards has recently been reaffirmed. *See Allain-Lebreton Co. v. Department of the Army*, 670 F.2d 43, 45 (5 Cir.1982); *Vazza v. Campbell*, 520 F.2d 848, 850 (1 Cir.1975); *Joiner v. Dallas*, 380 F.Supp. 754 (N.D.Tex.) (three-judge court), *aff'd mem.*, 419 U.S. 1042, 95 S.Ct. 614, 42 L.Ed.2d 637 (1974).

The WMATA Compact, however, makes no pledge of the federal faith and credit and explicitly proscribes a pledge of the credit of Maryland, Virginia, and the District of Columbia for just compensation liabilities incurred by WMATA's condemna-

tion activities. Instead, section 82(c) of the Compact indicates that WMATA is to bear all such liabilities. WMATA's resources to pay these awards are limited, however, because it has no taxing power and must instead rely on issuing revenue bonds, borrowing funds in anticipation of operating revenues, and receiving contributions, if any, from the signatories and the federal government. Clearly none of this constitutes the public credit. It is true that under section 22 of the Compact WMATA is not permitted to incur liabilities until sufficient funds are available to pay those expenses. But the present case demonstrates the inadequacy of that guarantee; WMATA estimated that it was spending $1.7 million to condemn appellant's property when it was actually spending almost $5 million.

Notwithstanding WMATA's inability to pledge the public credit, we think that constitutionally adequate just compensation is guaranteed. Under § 12(a) of the Compact, WMATA has the ability to be sued, and § 82(c) of the Compact specifically sanctions such liability.[16] When this is combined with the admitted and uncontestable fact that WMATA owns very substantial assets, we think that just compensation is, to a virtual certainty, guaranteed. The record itself reveals that the mass transit facilities now being built on Visnich's property are merely part of an extension to already-existing lines. We also take judicial notice of the fact that the existing mass transit system in Washington, owned by WMATA, consists of very substantial personal and real property.[17] We think it

clear, therefore, that were WMATA not to pay any just compensation award, the landowner could attach, and have execution on, sufficient WMATA assets to satisfy the liability. It is true that WMATA is permitted under the Compact to mortgage any and all of its assets, but the landowner has produced no evidence that insufficient unencumbered assets exist whereby the judgment could be satisfied.[18] We thus hold that WMATA has been delegated federal quick-take condemnation authority and that its use of such authority satisfied the constitutional requirements of the Fifth and Fourteenth Amendments' "just compensation" guarantee.

The landowner's final argument is that if the WMATA Compact is construed so as to permit quick-take condemnation, Maryland violated its state constitution in joining the Compact. As noted above, article III, section 40 of the Maryland Constitution prohibits the legislature from enacting laws authorizing private property to be taken for public purpose without the prior payment of just compensation.

We see no merit in this argument. First, the Court of Appeals of Maryland held in *Dutton v. Tawes*, 225 Md. 484, 500, 171 A.2d 688, 695–96 (1961), that the Maryland legislature's "power to make a contract by statute, that is to say, a compact, with a sister state, is a power inherent in sovereignty limited only by the requirement of Congressional consent under Art. I, Sec. 10, of the Constitution of the United States."[19] Second, we think that the Maryland Constitution's prohibition against laws authorizing quick-take condemnation merely with-

---

16. In addition, of course, WMATA's filing under 40 U.S.C. § 258a vests the right to compensation in the landowner.

17. Section 3(b) of the WMATA consent legislation provided for the transfer to WMATA of substantial real and personal property and other assets by the President.

18. We need not at this time, therefore, decide whether a landowner would have any remedy should the Authority prove to be unable to pay a just compensation award or appear to be unable to pay such an award at the time of taking.

19. In *Dutton*, an interstate compact between Maryland and Virginia had established a joint commission to regulate the conduct of Marylanders on the Potomac River. A Maryland citizen alleged that the Maryland legislature's delegation to the commission of legislative and police powers violated the Maryland Constitution. But the court rejected this challenge, as quoted in the text, holding that the power to enter into interstate compacts is inherent in Maryland's authority.

draws from the state the power of quick-take condemnation that, as a sovereign, it would otherwise possess;[20] the prohibition does not, however, bar Maryland from exercising that power when delegated to it by the federal government.[21] We thus hold that Maryland was not barred by its constitution from entering into the Compact.

The judgment of the district court upholding WMATA's use in this case of quick-take condemnation powers under 40 U.S.C. § 258a is therefore correct.

## IV.

As noted above, the shortfall between the amount deposited by the Authority into the registry of the court at the time of taking and the final just compensation award was $3,286,803. The deposit was made on May 12, 1978, and the final judgment entered on May 29, 1981. The government concedes that although the Declaration of Taking Act, 40 U.S.C. § 258a, provides for interest at a 6% per annum rate on any deficiency, that figure is merely a floor on the allowable interest. *See United States v. Blankinship,* 543 F.2d 1272, 1275–76 (9 Cir.1976). Visnich contends that the annual interest rate should not be less than the 13.5% that the court clerk achieved on the deposited funds by investing them in United States Treasury bills. The district court, however, based its annual interest rate on Moody's Composite Index of Yields on Long Term Corporate Bonds.

The choice of an appropriate rate of interest is a question of fact, to be determined by the district court, *see id.* at 1276, and the district court's judgment will be upset only if it reaches a clearly erroneous result. In fixing an award of interest, the district court should attempt to determine what "a reasonably prudent person investing funds so as to produce a reasona-

ble return while maintaining safety of principal" would have achieved. *United States v. 429.54 Acres of Land,* 612 F.2d 459, 465 (9 Cir.1980). We think that use of the Moody's index yielded an award that satisfactorily approximates that return. Moreover, we note that this method has been endorsed by the Court of Claims. *See Pitcairn v. United States,* 547 F.2d 1106 (Ct.Cl. 1976), *cert. denied,* 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978). We therefore see no reason to disturb the judgment of the district court fixing the rate of interest on the just compensation deficiency.[22]

AFFIRMED.

---

**20.** *See Lore v. Board of Public Works,* 277 Md. 356, 358, 354 A.2d 812 (1976); *Riden v. Philadelphia, Baltimore and Washington RR Co.,* 182 Md. 336, 339, 35 A.2d 99 (1943).

**21.** This interpretation is also suggested by *West Virginia ex rel. Dyer v. Sims,* 341 U.S. 22, 30–32, 71 S.Ct. 557, 561–562, 95 L.Ed. 713 (1951), which indicated that state constitutional

provisions should be construed, if possible, so as to permit continued state participation in the interstate compact.

**22.** In similar vein, we think that the district court did not exceed its discretion in declining to compound the interest allowance.