**SEAL AND COMPANY, INC., Plaintiff,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY and Dynatran, A Division of Dynalectric Company, Defendants.**

Civ. A. No. 91–682–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

July 8, 1991.

Paul Terrence O'Grady, Falls Church, Va., for Seal and Co., Inc.

Thomas Bentley Dorrier, Associate Gen. Counsel, Washington, D.C., for Washington Metropolitan Area Transit Authority.

Douglas L. Patin and Frank Filiatreau, Kilcullen, Wilson & Kilcullen, Washington, D.C., for Dynatran, Div. of Dynalectric Co.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

This is a disappointed bidder's challenge to a contract award made by the Washington Metropolitan Area Transit Authority ("WMATA"). It raises the infrequently litigated issue of whether an unsuccessful bidder has standing to challenge the contract award of an interstate agency created by interstate compact. Plaintiff, the unsuccessful bidder, charges that WMATA's award was unlawful and seeks cancellation of the award together with issuance of a permanent injunction enjoining WMATA from awarding the contract to any party other than plaintiff.

Plaintiff originally moved for a preliminary injunction. Pursuant to Rule 65(a)(2), Fed.R.Civ.P., the hearing on the preliminary injunction was consolidated with the hearing on the merits. At the consolidated

hearing, the parties argued the issues orally and submitted the case on the basis of stipulated facts, briefs and oral arguments. On the basis of the record as a whole, the Court concludes that plaintiff has standing to challenge WMATA's contract award, but that plaintiff's claims lack merit. Accordingly, plaintiff is not entitled to the relief sought.

### Facts [1]

Plaintiff, Seal and Company, Inc., is a District of Columbia corporation having its principal place of business in Chantilly, Virginia. It is engaged in the electrical contracting business and has successfully bid on and performed contract work for WMATA since 1972. Defendant WMATA is an interstate agency created by the Washington Metropolitan Area Transit Authority Compact ("the Compact") executed by Virginia, Maryland and the District of Columbia and approved by Congress [2] in accordance with the U.S. Const. art. I, § 10, cl. 3. WMATA, under the Compact, is charged with operating the Metro system serving the Washington metropolitan area. Defendant Dynatran is a corporation having its principal place of business in Sterling, Virginia. It is the successful bidder for the challenged contract award.

On February 19, 1991, WMATA issued Invitation for Bids No. IFB–C–882 ("the IFB") requesting bids on the construction of the communications system for Metro's Green Line between Fort Totten and Greenbelt, Maryland. The IFB contained a "Buy American Certificate" which bidders were expected to execute, along with numerous other certificates.[3] WMATA received numerous bids. Plaintiff was the low bidder, but had not executed the Buy American Certificate contained in its bid. Dynatran was the second lowest bidder. No allegations have been made suggesting that Dynatran's bid failed in any way to conform to the IFB. Upon opening the bids and noting plaintiff's unexecuted Buy American Certificate, WMATA contacted plaintiff's representatives, who in turn immediately forwarded an executed Buy American Certificate. That same day, however, WMATA verbally advised plaintiff that it regarded plaintiff's bid as nonresponsive because, as initially submitted, the bid did not include an executed Buy American Certificate. On April 18th and 19th, plaintiff sent letters to WMATA protesting the determination that its bid was nonresponsive. As the next lowest bidder and beneficiary of this determination, Dynatran protested any award to plaintiff. By letter dated May 6, 1991, WMATA's contracting officer issued his final decision denying plaintiff's protest and confirming the determination that plaintiff's bid was nonresponsive. Plaintiff then initiated this action by filing its complaint on May 16, 1991.

### Analysis

This Court has subject matter jurisdiction pursuant to Section 81 of the Compact.[4] Plaintiff contends that WMATA has acted arbitrarily and in violation of its own procurement regulations and existing law by failing to award the disputed contract to plaintiff, as the lowest responsible bidder. In particular, plaintiff contends that completing the Buy American Certificate is not a condition of responsiveness. Alternatively, plaintiff contends that even if the Buy American Certificate is a condition of re-

---

**1.** This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a), Fed.R.Civ.P.

**2.** Act of Congress, Pub.L. No. 89–774, 80 Stat. 1324, 1353 (November 6, 1966), noted to D.C.Code §§ 1–2411 *et seq.* (1990).

**3.** WMATA was required by regulations of the Urban Mass Transit Administration ("UMTA"), *see* 49 C.F.R. § 661.13 (1990), to include a Buy American Certificate in the IFB. In turn, these regulations implement the Buy American Act, 41 U.S.C. §§ 10a–10d.

**4.** Section 81 of the Compact states:

The United States District Courts shall have original jurisdiction, concurrent with the Courts of Maryland and Virginia, of all actions brought by or against the Authority and to enforce subpoenas issued under this Title. Any such action initiated in a State Court shall be removable to the appropriate United States District Court in the manner provided by Act of June 25, 1948, as amended (28 U.S.C. 1446).

D.C.Code § 1–2431, Va.Code §§ 56–529 and – 530.

sponsiveness, its requirements are incorporated into the specifications of the IFB and hence, by signing the IFB, plaintiff bound itself to purchase only domestic supplies. Finally, plaintiff argues that WMATA may not penalize it for failing to sign the Buy American Certificate since WMATA did not explicitly give notice in the IFB that signing the Certificate was a condition of responsiveness and because the Certificate was ambiguously worded. In opposition, WMATA maintains that disappointed bidders such as plaintiff lack standing to challenge WMATA's contract awards. Alternatively, WMATA maintains that its rejection of plaintiff's bid as nonresponsive was reasonable and in accordance with WMATA regulations and relevant procurement decisions of the Comptroller General. Since standing is a threshold matter, it is addressed first followed by the merits issues.

## I.

The standing issue has two parts, one concerning the existence of a "private cause of action," and the second relating to "standing" or "injury." More specifically, the Court must first determine whether Congress in enacting the Compact intended to create "a cause of action" for private parties aggrieved by WMATA's alleged failure to follow the procurement procedures mandated by the Compact. "The question whether a statute creates a cause of action, either expressly or by implica-

tion, is basically a matter of statutory construction." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 245, 62 L.Ed.2d 146 (1979). "[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted...." *Id.* at 15–16, 100 S.Ct. at 245. This intent may appear explicitly in the language of a statute or its legislative history, or "[s]uch an intent may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment." *Id.* at 18, 100 S.Ct. at 246; *see Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 516, 98 L.Ed.2d 512 (1988); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). If the Court finds that Congress intended to create a private cause of action, it must then determine whether the plaintiff alleges an injury of the kind intended to be protected by the Compact, *i.e.*, whether plaintiff's alleged injury falls within the "zone of interests"[5] Congress intended to protect.

When the action of a *federal* agency is at issue, the two part analysis just described is somewhat simplified. The first question—is there a private cause of action or remedy?—is presumed to have been answered affirmatively by Congress, absent evidence to the contrary.[6] This is so because § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, authorizes suits by any person "suffering legal wrong

---

**5.** In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), the Supreme Court explained that

[s]tanding doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.... The requirement of standing, however, has a core component derived directly from the Constitution. A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.

*Id.* at 751, 104 S.Ct. at 3324 (citations omitted). Here, the chief issue is whether the interest of

bidders in fair treatment in the procurement process was intended by Congress to fall within the "zone of interests" protected by the Compact. Once this requirement is met, the constitutional requirements that plaintiff allege a personal injury, traceable to defendant's conduct and likely to be redressed are easily met.

**6.** *See Japan Whaling Ass'n v. American Cetacean Society*, 478 U.S. 221, 231 n. 4, 106 S.Ct. 2860, 2866 n. 4, 92 L.Ed.2d 166 (1986) (stating that when review of federal agency action is sought, "[a] separate indication of congressional intent to make agency action reviewable under the APA is not necessary; instead, the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to preclude review").

because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Given the presumption of the existence of a private cause of action for challenging *federal* agency action, only the "zone of interests" issue remains, and here the primary question is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute...." *Association of Data Processing Serv. Orgs. v. Camp,* 397 U.S. 150, 152–53, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).[7] The "zone of interest" test, since it is usually employed in the context of the APA, "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Industry Ass'n,* 479 U.S. at 399–400, 107 S.Ct. at 757. Rather, "[t]he essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Id.* at 399, 107 S.Ct. at 757, quoting *Block v. Community Nutrition Institute,* 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984).

■ Numerous Circuits, including the Fourth, have held that a disappointed bidder for a *federal* agency contract is a person "adversely affected or aggrieved by agency action" pursuant to § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and has standing to challenge an agency's contract award in federal court. *See Motor Coach Industries, Inc. v. Dole,* 725 F.2d 958, 962–64 (4th Cir.1984); *William F. Wilke, Inc. v. Department of the Army,* 485 F.2d 180, 182–83 (4th Cir. 1973); *Hayes International Corp. v. McLucas,* 509 F.2d 247 (5th Cir.), *cert. de-nied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Airco Inc. v. Energy Research and Development Administration,* 528 F.2d 1294 (7th Cir.1975) (per curiam); *Armstrong & Armstrong, Inc. v. United States,* 514 F.2d 402 (9th Cir.1975) (per curiam); *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). As the Fourth Circuit noted in *Wilke:*

> While those seeking Government contracts have no right to the award of a contract, they do have a right to reasonable treatment of their bids.... This right derives from the combination of the statutory scheme regulating [the agency's] procurement ... and the review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

485 F.2d at 182. These decisions have recognized both a Congressional intent to safeguard the interest of bidders in fair treatment, *see, e.g., Wilke,* and a Congressional intent to rely on bidders to enforce procurement statutes, *see, e.g., Scanwell,* 424 F.2d at 866–67, 870–71.

In the present, unusual case, the agency involved—WMATA—is not a *federal* agency. Rather, it is "an instrumentality and agency of each of the signatory parties—the District of Columbia, Maryland, and Virginia." *Washington Metro. Area Transit Authority v. One Parcel of Land,* 706 F.2d 1312, 1314 (4th Cir.), *cert. denied,* 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983); *see* the Compact, § 4. Hence, it is not subject to the APA. This does not end the analysis, however. Section 73 of the Compact states, in relevant part:

> Contracts for the construction, reconstruction or improvement of any facility when the expenditure required exceeds twenty-five thousand dollars ($25,000) and contracts for the purchase of sup-

---

7. In *Association of Data Processing Service,* and its companion case, *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), the Supreme Court set forth the standing criteria for persons attempting under the APA to seek review of agency action. It held that standing depended upon a two-part inquiry: (i) whether plaintiffs had alleged the constitutional minimum requirement of injury in fact; and (ii) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service,* 397 U.S. at 152–53, 90 S.Ct. at 830. As the Supreme Court has recently pointed out, this test is a "gloss on the meaning of § 702" of the APA. *Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 395, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987); *see* P. Low & J. Jeffries, *Federal Courts and the Law of Federal–State Relations* (2d ed. 1989) at 48–49.

plies, equipment and materials when the expenditure required exceeds ten thousand dollars ($10,000) shall be advertised and let upon sealed bids to the lowest responsible bidder. Notice requesting such bids shall be published in a manner reasonably likely to attract prospective bidders, which publication shall be made at least ten days before bids are received and in at least two newspapers of general circulation in the Zone.[8]

There can be no doubt that "the WMATA Compact became federal law when consented to by Congress," *Washington Metropolitan Area Transit Authority v. One Parcel of Land*, 706 F.2d at 1318, and that the interpretation of Section 73 "presents a question of federal law." *Id.* at 1318. The question here is whether Congress intended, in enacting the Compact and Section 73, for bidders to bring private causes of action to enforce the compacts' procurement provisions.

Two courts have addressed this issue, one directly and one indirectly. In *Otis Elevator Co. v. Washington Metropolitan Area Transit Authority*, 432 F.Supp. 1089 (D.D.C.1976), the Court upheld a disappointed bidder's standing to challenge a WMATA contract award, and also upheld the bidder's objections to the award. Without elaboration, the Court found that the "federal interest" in the WMATA Compact supported application of "general standing criteria," which the plaintiff easily met.

*Id.* at 1094. In essence, the court concluded that because of the strong "federal interest" in the WMATA Compact, WMATA should be treated as a federal agency subject to the APA with respect to standing, and the "zone of interests" test for challenging federal agency action set forth in *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. at 152–53, 90 S.Ct. at 829–30, should be applied. Because court rulings interpreting the APA had recognized that a bidder has an "interest" in seeing that a federal agency follow procurement statutes and regulations, the *Otis* Court concluded that the plaintiff easily met the requirement of falling within the zone of interests protected by the WMATA Compact's procurement provisions and the implementing regulations enacted by WMATA.

In concluding that the WMATA Compact was imbued with a "federal interest," the *Otis* court relied on *The Bootery, Inc. v. Washington Metropolitan Area Transit Authority*, 326 F.Supp. 794 (D.D.C.1971). There, the Court also concluded that WMATA, because of the special federal interest it embodied, should be treated like a federal agency subject to the APA. It held that business lessees had standing under Section 14 of the Compact[9] to protest the hearing procedures employed by WMATA in selecting a transit route. Hence, both *The Bootery* and *Otis* opinions concluded that WMATA was akin to a federal agency

---

**8.** Section 73 continues as follows:

The Board may reject any and all bids and readvertise in its discretion. If after rejecting bids the Board determines and resolves that, in its opinion, the supplies, equipment and materials may be purchased at a lower price in the open market, the Board may give each responsible bidder an opportunity to negotiate a price and may proceed to purchase the supplies, equipment and materials in the open market at a negotiated price which is lower than the lowest rejected bid of a responsible bidder, without further observance of the provisions requiring bids or notice. The Board shall adopt rules and regulations to provide for purchasing from the lowest responsible bidder when sealed bids, notice and publication are not required by this section. The Board may suspend and waive the provisions of this section requiring competitive bids whenever:

(a) the purchase is to be made from or the contract is to be made with the Federal or any State government or any agency or political subdivision thereof or pursuant to any open-end bulk-purchase contract of any of them;

(b) the public exigency requires the immediate delivery of the articles;

(c) only one source of supply is available; or

(d) the equipment to be purchased is of a technical nature and the procurement thereof without advertising is necessary in order to assure standardization of equipment and interchangeability of parts in the public interest.

**9.** Section 14 states that "[t]he Board, in the preparation, revision, alteration or amendment of a mass transit plan, shall ... consider data with respect to ... [the] impact of transit plans on the dislocation of families and businesses...."

and that, under the "zone of interests" test applicable to such agencies, private parties had Congressional authority to seek judicial review of WMATA actions that caused them injury and violated statutory procedural requirements.

Although not employing precisely the same analysis as *Otis* and *The Bootery*, this Court also concludes that Congress intended that private parties have standing to challenge WMATA's procurement actions. And this result is compelled whether WMATA is viewed (1) as a non-federal agency and a "private cause of action" analysis is employed using the techniques of statutory interpretation outlined in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. at 15, 100 S.Ct. at 245, *Thompson v. Thompson*, 108 S.Ct. at 516, and *Touche Ross & Co. v. Redington*, 442 U.S. at 568–573, 99 S.Ct. at 2485–2488, or (2) as a quasi-federal agency and a "zone of interests" test is applied. The language and legislative history of Section 73 reflect that Congress intended WMATA to follow federal procurement regulations and to perform procurements as a federal agency would. Thus, Section 73 requires that contracts be "let upon sealed bids to the lowest responsible bidder." The term "lowest responsible bidder" is a term of art drawn from federal procurement regulations.[10] Its use suggests that Congress intended WMATA to conduct procurements in a fashion similar to federal agencies. More evidence of this Congressional intent comes from a 1988 amendment to Section 73.[11] At that time, Congress approved raising the dollar limits that trigger Section 73's requirements. The House Report accompanying the bill that amended Section 73 reproduces in full the testimony of UMTA's Assistant Chief Counsel justifying this change:

Finally, the procurement amendment would raise the threshold for advertising contract bids for supplies and equipment from $2,500 to $10,000 and for construction and reconstruction contract bids from $10,000 to $25,000. These changes are consistent with Federal procurement policy. We understand that these are the only procurement changes proposed in this amendment, and that WMATA's current procurement regulations, which follow Federal requirements, will not otherwise be affected by this amendment.

This testimony, heavily relied upon in the House Report, further supports the conclusion that Congress intended WMATA to function as a federal agency with respect to procurements. This is also reflected in WMATA's extensive procurement regulations, which state that they

implement pertinent provisions of the Washington Metropolitan Area Transit Authority Compact; OMB Circular A–102 ... UMTA Circular C 4220.1, dated August 6, 1979 and relevant decisions of the courts and the Comptroller General of the United States.

Moreover, the existence of a cause of action for disappointed bidders is arguably implicit in Section 73 and in the scheme of the Compact, for if private bidders on WMATA's contracts lacked standing to challenge WMATA's awards, it is hard to see how Section 73's mandate that contracts be awarded to the lowest responsible bidder would be monitored and enforced.

Yet additional evidence that Congress envisioned that WMATA would function like a federal agency with respect to procurements is apparent from the unique nature of WMATA. The WMATA Compact is distinguishable from other Congressionally-approved compacts by the degree of feder-

---

**10.** *See, e.g.,* Federal Acquisition Regulations, 49 C.F.R. §§ 9.101, 9.104–1 (1990) (defining the term "responsible prospective contractor"); 49 C.F.R. § 14.407–1 (directing contracting officer conducting sealed bids to "make a contract award ... to that responsible bidder whose bid, conforming to the invitation, will be the most advantageous to the Government, considering only price and the price-related factors ... included in the invitation"); and 49 C.F.R. § 14.-

407–2(a) ("The contracting officer shall determine that a prospective contractor is responsible ... and that the prices offered are reasonable before awarding the contract").

**11.** *See* Washington Metropolitan Area Transit Regulation Compact Amendments, Pub.L. 100–285, 102 Stat. 82 (1988).

al participation in both the formation of the Compact and its continued operation. Congress, rather than the participating states, was the motivating force behind creation of the Compact.[12] Furthermore, Congress, on behalf of the District of Columbia, was one of the parties agreeing to the Compact.[13] Moreover, the Compact, in creating WMATA, created an agency that took over the functions of a previously existing federal agency, the National Capital Transportation Agency ("NCTA"), which hitherto had begun planning and contracting work on a transportation system for the Washington, D.C. area. As Congress intended that federal agencies be subject to the APA in their procurement activities,[14] and as WMATA replaced NCTA, it is likely that Congress also intended that WMATA be subject to APA-like review of its procurement activities. And beyond this, large amounts of federal tax dollars flowed to WMATA at its inception and the federal government remains obligated to fund a portion of any shortfalls between WMATA's expenses and its fare box receipts.[15] And the legislative

history is replete with statements to the effect that while Congress did not desire the federal government to be involved "in the day-to-day operation of" the Metro system, it did want to "protect the federal interest" in the system.[16] Finally, the Court notes that Congress, when amending WMATA's Compact in 1972 and again in 1988, could have taken notice of the 1971 decision in *The Bootery* and the 1976 decision in *Otis*, each equating WMATA with a federal agency subject to the APA, and expressly disapproved of these opinions, had Congress in fact disagreed with them. It did not.

In summary, all of these factors point collectively and persuasively to the conclusion that Congress intended WMATA to conduct its procurements as a federal agency would, and to be subject to suits by aggrieved bidders for procurement activities in violation of the Compact or WMATA's regulations.[17] Thus, as an aggrieved bidder, plaintiff has standing to sue.

**12.** *See* National Capital Transportation Act, Pub.L. 86–669, 74 Stat. 537 (1960); National Capital Act, Pub.L. 89–173, 79 Stat. 666 (1965).

**13.** As one Congressman remarked during debates on ratifying the Compact: "This is an unusual compact, however. It is not the usual situation. Usually the compact is between two or three sovereign States, and they agree upon something, come to the Congress, and we approve it or disapprove it. In this case the Congress is one of the legislative branches involved in agreeing on the compact." 112 Cong.Rec. 25656 (1966) (statement of Rep. Whitener).

**14.** *See Scanwell, Wilke* and similar cases discussed in the text *supra.*

**15.** Upon taking over from the National Capital Transportation Agency, WMATA became the heir to $100 million dollars that Congress had already committed on behalf of the federal government and $50 million that Congress had committed on behalf of the District of Columbia for developing the capital's transportation system. The federal contribution, at the time of enactment, was expected to be increased to approximately $400 million dollars. Moreover, the federal government agreed to share any costs in excess of fare receipts with the participating states and the District of Columbia. *See* S.Rep. No. 1491, 89th Cong., 2nd Sess. 6–7, 21, 24 (1966); H.R.Rep. No. 1914, 89th Cong., 2d Sess. (1966); 112 Cong.Rec. 25656–57 (1966) (statement of Rep. Poff); the Compact, § 16.

**16.** *See, e.g.,* S.Rep. No. 1491, 89 Cong., 2d Sess. 21 (1966).

**17.** *Sowell's Meats and Services, Inc. v. McSwain,* 788 F.2d 226 (4th Cir.1986), relied on by WMATA, is not to the contrary. In *Sowell's,* the Fourth Circuit affirmed the district court's finding that the national school lunch program, *see* 42 U.S.C. §§ 1751–1779, did not confer a private right of action on disappointed bidders in procurements conducted by state public school districts. The Fourth Circuit framed its analysis in this fashion:

We must, therefore, examine federal law dealing with the procurement of food for the national school lunch program to determine whether Congress intended to afford standing to disappointed bidders to sue state agencies that are recipients of federal aid.

*Id.* at 228. Following this analytical framework, the Fourth Circuit panel noted that Congress authorized the Secretary of Agriculture to prescribe regulations for the operation of the school lunch program. The regulations adopted by the Secretary "authorize[d] grantees to use their own procedures and apply local laws." *Id.* The Fourth Circuit panel concluded that:

Neither the statute, the regulations, nor [OMB Circular A–102] expressly confer standing on a disappointed bidder to question a state agency's award of a procurement contract, and we find no *implicit conferral* of standing. *The standards do not require state agencies to award a contract to the low bidder.*

## II.

 Plaintiff's first merits claim is that failure to sign the Buy American Certificate did not render its bid nonresponsive to the IFB. This claim fails. First, regulations promulgated by the Urban Mass Transit Administration ("UMTA"), an agency of the U.S. Department of Transportation from which WMATA receives grants, mandate that WMATA require its bidders to complete a Buy American Certificate as a "condition of responsiveness." [18] Consistent with this, the Comptroller General's standards for bid responsiveness make clear that plaintiff's bid, without the signed Buy American Certificate, was nonresponsive. In a recent decision involving a Buy American Certificate, the Comptroller General concluded that, even where a bidder may not have fully completed such a certificate, a bid may be responsive to an IFB where "there would be no opportunity after bid opening for the bidder to affect the relative standing, or acceptance or rejection, of its bid." *Manatts, Inc.*, B–237532, February 16, 1990, 90–1 CPD ¶ 287. Put another way:

> ... a bid should *not* be rejected as nonresponsive because it does not contain all of the information necessary to perform a Buy American Act analysis *only where*

the additional information required from the bidder would not change the relative standing of the bidders ... or allow the bidder to manipulate its bid to its advantage.

*Id.*

It is clear from *Manatts* and other Comptroller General decisions [19] that the language of a specific Buy American Certificate, and the IFB containing it, must be examined to determine whether failure to complete the certificate permits material alteration of a bid subsequent to the opening of bids and hence renders a bid nonresponsive. In this case, the Buy American Certificate really contained two certificates: one for the bidder to check, sign and date if it pledged to comply with the domestic content and assembly requirements of the Buy American Act, and an alternative one to be checked, signed and dated if the bidder did not intend to comply but believed it qualified for an exception to the Buy American Act requirements. Plaintiff checked neither certificate. Had plaintiff checked the second, foreign source certificate, either before or after the opening of bids, WMATA would have been required by UMTA regulations to increase plaintiff's bid price by ten percent. [20] Thus, plaintiff's

---

*Id.* (emphasis added). By way of further explanation, the panel wrote that the broad discretion "allowed the contracting officer demonstrates a lack of a property interest or of any protected right in federal procurement procedures and indicates that judicial review ... is inappropriate." *Id.* at 229.

The analysis used in *Sowell's* is the same as that used here. A different result is compelled here because there is a federal statute mandating that WMATA award contracts only to the lowest responsible bidder. Additionally, as noted in the text, there are other indicia of Congressional intent to permit and authorize judicial review of actions by disappointed WMATA bidders.

**18.** UMTA regulations state in relevant part:

 (a) The grantee [here, WMATA] shall adhere to the Buy America clause set forth in its grant contract with UMTA.

 (b) The grantee shall include in its bid specification for procurement within the scope of these regulations an appropriate notice of the Buy America provision. Such specifications shall require, *as a condition of responsiveness,*

that the bidder or offeror submit with the bid a completed Buy America certificate in accordance with § 661.6 or § 661.12 of this part, as appropriate.

49 C.F.R. § 661.13 (1990) (emphasis added).

**19.** *Compare Manatts; Bulloch International, Inc.,* B–237369, Feb. 5, 1990, 90–1 CPD ¶ 153; General Counsel's Letter Opinion, April 4, 1972, 51 Comp.Gen. 814 (1972), each finding that irregularities associated with Buy American Certificate rendered bid nonresponsive, *with Illinois Constructors Corp.,* B–209214, Feb. 28, 1983, 83–1 CPD ¶ 197; *Avantek,* B–170498, March 30, 1971, 50 Comp.Gen. 697, each finding that Buy American Certificate irregularities did not render bid nonresponsive.

**20.** The bid of a bidder who checks the foreign source certification will not be rejected if the bidder qualifies for an exception to the domestic content and assembly requirements of the Buy American Act. An exception to these requirements is permitted where "the inclusion of domestic materials will increase the cost of the overall project contract by more than 10 percent in the case of projects for the acquisition of buses, rolling stock ... and train control equip-

failure to check either certificate left it in a position to manipulate the bid to its advantage. For example, if plaintiff's bid was more than ten-percent below the next lowest bid, plaintiff could have increased its price ten percent simply by checking the foreign source certificate and still have received the contract. Similarly, if the bid were less than ten percent below the next lowest bidder, plaintiff could decide whether to check the domestic source certificate and win the contract as the lowest bidder, or to check the foreign source certificate and avoid winning the contract. A bidder might choose the latter course of action where it belatedly recognized that it would loose money if forced to perform at the bid price. This potential for manipulating the process by leaving the Buy American Certificate unsigned underscores the materiality of the requirement that the bidder properly complete the Buy American Certificate.

Plaintiff contends, however, that merely by signing its bid it bound itself to comply with the domestic component and assembly requirements of the Buy American Act. This contention is baseless. By signing the bid, plaintiff bound itself to "perform all work ... in strict accordance with the Specifications, appendices, certifications, Contract Drawings, schedules, insurance specifications, and [certain other] conditions" of the IFB.[21] Although plaintiff contends that the specifications sections of the IFB bound it to use only domestic sources, it points to no specific language to this effect and none has been found.[22] Only the Buy American Certificate contained in the IFB pertains to this issue and, as already noted, plaintiff failed to complete the certificate. Even so, plaintiff maintains that it was bound by law upon submission of its bid to use only domestic sources. But, as noted above, the Buy American Act and UMTA regulations permit the use of foreign sources if a bidder qualifies for an exception. Here, plaintiff simply failed to note whether it intended to provide only domestic products or to seek an exception. Finally, plaintiff argues that since it supplied WMATA with a properly completed Buy American Certificate shortly after bid opening, the contracting officer acted arbitrarily in rejecting its bid. However, "only material available at bid opening may be considered in making a responsiveness determination." *Bulloch International, Inc.,* B-237369, February 5, 1990, 90–1 CPD ¶ 153; *accord Rocco Indus., Inc.,* B-227636, July 24 1987, 87–2 CPD ¶ 87.[23] There is, therefore, no basis for concluding that the contracting officer acted arbitrarily in choosing to ignore plaintiff's after-bid submission. In sum, an examination of the specific Buy American Certificate at issue, the language of the IFB as a whole, and applicable law all show that plaintiff's failure to check either the domestic or foreign source certificate was a

ment, communication equipment, and traction power equipment." 49 C.F.R. § 661.7(d) (1990). Thus, when confronted with a bidder who checks the foreign source certification, WMATA is required by UMTA regulations to do the following:

In determining whether the exception will be granted, the lowest responsive and responsible bid offering a non-United States produced item will be multiplied by 1.1.... If the resulting amount is less than the lowest responsive and responsible bid offering all items produced in the United States, then the exception will be granted.

*Id.*

**21.** IFB at BF–1.

**22.** It is true that on pages I–45 and I–46 provisions from the Buy American Act are reproduced. However, these provisions do not themselves bind a party signing the IFB to provide only domestic source products. Only the Buy American Certificate appearing at page BF–6 of the IFB contained language binding the bidder if checked.

**23.** Plaintiff also contends that its late submission of the executed Buy American Certificate should have been accepted pursuant to WMATA procurement regulations which permit a WMATA contacting officer to waive a "minor informality or irregularity" in a bid. WMATA Procurement Policies, Chapter II, § 5(f); *see also* 48 C.F.R. § 14.406 (1990) (permitting correction of inconsequential mistakes in bids). Chapter II, § 5(f) defines a "minor informality or irregularity" as "a matter of form and not of substance," and states that a deviation from an IFB is immaterial "when its significance as to price ... is trivial or negligible." As already noted, plaintiff's failure to sign the Buy American Certificate was a material error having a significant effect on price. Hence, § 5(f) is inapplicable.

material omission that rendered its bid nonresponsive.

■ Retreating one step, plaintiff contends that its failure to complete the Buy American Certificate should be excused because WMATA failed to give notice in the IFB that not completing one or the other alternative certificate would render a bid nonresponsive. Plaintiff maintains that UMTA regulations at 49 C.F.R. § 661.13 required WMATA to print such a warning. This argument, too, is unpersuasive. First, the UMTA regulations relied on do not explicitly require the printed warning plaintiff demands. Moreover, even assuming notice of some sort was required, the IFB arguably gave adequate notice by incorporating by reference those provisions of the Buy American Act and UMTA regulations that require completion of the Buy American Certificate.[24]

■ Plaintiff's last argument is that the Buy American Certificate was ambiguously worded and that this, too, should excuse noncompletion of the Certificate. Specifically, plaintiff objects to the first sentence of the Certificate, which reads:

> If buses or other rolling stock (including train control, communications and traction power equipment) are being procured, the appropriate certificate as set forth below shall be completed and submitted by each bidder in accordance with the requirements contained in 661.13(b) of this Part [49 C.F.R. § 661.13(b) ]....

Plaintiff's president and chairman maintain that because the words "train control, communications ... equipment" appeared in parentheses rather than between commas, they were justified in construing such words to refer only to such equipment *if installed or located on* a bus or train car. They therefore concluded that the Buy American Certificate did not apply to the instant procurement, which was for train communications equipment to be installed in Metro's stations and tunnels.

Plaintiff's contention strains credulity. First, a reasonable reading of the sentence leads to the conclusion that it applied to the equipment at issue, as equipment used to control and communicate with trains and for traction is located outside, as well as within, trains. Moreover, this precise language is ubiquitous in the realm of transportation procurement. It appears *verbatim* (including the parentheses) at 49 C.F.R. § 661.12 (1990), and is the language UMTA apparently requires grant recipients to use in IFBs. Moreover, the parties have stipulated that plaintiff's officers previously read and executed a Buy American Certificate containing identical language that appeared in a prior WMATA IFB for "off-board" communications equipment. The Court therefore concludes that there is no ambiguity in the IFB language that excuses plaintiff's failure to complete the certificate.

■ Moreover, the term "communications equipment" is defined in detail at 49 C.F.R. § 661.11, a section specifically referenced in the IFB's Buy American Certificate. Section 661.11(i) lists communications equipment located outside of rolling stock.[25] Hence, even assuming that plaintiff's officers, despite their considerable experience with transportation procurements, were confused by the language quoted above, they were obligated to be familiar

---

**24.** Actual provisions of the Buy American Act pertaining to train control and communication equipment, the equipment at issue here, were reprinted in the IFB at pages I–45 and I–46. Moreover, on pages I–46 and BF–6 of the IFB, the UMTA regulations at 49 C.F.R. Part 661 were explicitly referenced. In particular, 49 C.F.R. § 661.13(b), which requires that the Buy American Certificate be included in any IFB as a condition of responsiveness, is referenced on page BF–6 in the first paragraph of the Buy American Certificate included in the IFB.

**25.** The regulation states in relevant part:

(i) Communications equipment includes, but is not limited to, the following equipment:
....
(10) Communication console at central control.
....
(13) Data transmission system central processors.
(14) Data transmission system remote terminals.
....
(17) Security console at central control.
49 C.F.R. § 661.11(i)(10), (13), (14), (17) (1990).

with 49 C.F.R. § 661.11(i). Finally, plaintiff's claim is untimely, as any claim that the language of an IFB is on its face ambiguous, or any latent ambiguity of which a contractor is aware, must be pursued prior to the opening of bids. *S.O.G. of Ark. v. United States*, 546 F.2d 367, 212 Ct.Cl. 125 (1976); *James A. Mann, Inc. v. United States*, 535 F.2d 51, 61, 210 Ct.Cl. 104 (1976); *Beacon Const. Co. v. United States*, 314 F.2d 501, 503–04, 161 Ct.Cl. 1 (1963); *Manatts, Inc.*, B–237532, February 16, 1990, 90–1 CPD ¶ 287; *Continental Water Systems Corp.*, B–205970, June 28, 1982, 82–1 CPD ¶ 627.

### Conclusion

The Court concludes that WMATA's rejection of plaintiff's bid as nonresponsive was in accordance with WMATA procurement regulations and applicable case law and hence was not arbitrary, capricious, or in violation of the law. Plaintiff's complaint should therefore be dismissed with prejudice.